Cecil W. ARMSTRONG et al.

v.

UNITED STATES.

No. 532–56.

United States Court of Claims.

March 1, 1961.

Burton R. Thorman, Washington, D. C., for plaintiffs. Solomon Dimond, Washington, D. C., was on the brief.

Laurence H. Axman, Washington, D. C., with whom was Acting Asst. Atty. Gen. Geo. S. Leonard, for defendant.

JONES, Chief Judge.

This case has been remanded to this court by the Supreme Court of the United States for the purpose of determining certain issues which are set out in the opinion in the case of Armstrong et al. v. United States, 1960, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554. The essential facts and the issues are clearly stated in the Court's opinion.

Briefly, the Rice Shipbuilding Corporation contracted for the construction of 11 Navy personnel boats. Pursuant to its terms, the Government terminated the contract before all of the boats had been completed. The completed boat and 10 uncompleted boats, together with all manufacturing materials acquired by Rice for building the boats, were transferred and delivered to the defendant.

The plaintiffs had furnished various materials to Rice for use in the construction of the boats. The Government removed the unfinished boats and all the materials then on hand to out-of-state Naval shipyards for use in completion of the boats.

According to the statutes of the State of Maine, the plaintiffs had a lien on any vessel for any labor or material furnished for the building of the vessel.

The plaintiffs have not been paid for the materials furnished and which are involved in this suit. The Supreme Court has held that in taking over this property on which the plaintiffs had a lien the defendant has taken property interests from the plaintiffs within the meaning of the Fifth Amendment, for which just compensation should be made if the property taken was of sufficient value above the amount of progress payments made to the shipbuilding company to cover payment of all or part of plaintiffs' claims. In view of our disposition we do not reach the issue of merger of defendant's lien.

578

The original contract called for the payment of $175,900 for the construction of the 11 Navy personnel boats. It is manifest, however, that the Rice Company had not made a very favorable contract for itself, because before the boats had been taken over it had spent $198,555.23 in the construction operation.

In the meantime the Government had made progress payments to the Rice Shipbuilding Corporation in the aggregate sum of $141,387.20.

The plaintiffs allege that the value of the ships at the time and place of taking, plus the value of the still unused material, was far above the amount of the progress payments plus the $21,129.-97 claimed by the plaintiffs.

The defendant asserts that the value of the 11 ships, plus the materials taken, was less than the amount of the progress payments. Thus comes the tug-of-war. The plaintiffs have moved for summary judgment. The defendant resists, claiming there are disputed issues that call for the taking of evidence.

In addition to the facts alleged and admitted in the pleadings and the various documents and exhibits that are filed with the papers in the case, the defendant has filed the affidavits of two expert witnesses, and the plaintiffs have filed affidavits of three expert witnesses. As usual, these opinions cover a wide range of value as applied to the ships and materials. This is not surprising. When a witness has qualified as an expert there is no sky or other limit by which the flight of his mind or judgment may be canopied. This is baffling to the layman who is somewhat awed in the presence of such overwhelming information and ability. Nevertheless, these expert witnesses are frequently men of vast experience who have observed and have learned much about the subject upon which they are able to qualify. Since the ships and materials were taken over in 1954 and this is 7 years later, there must be reliance to a material degree upon the opinion of experts.

Let us analyze as best we may the sworn statements and opinions of these experts. Andrew Pierce who at the time of making the affidavit was employed as a resident surveyor, United States Salvage Association, Inc., in Baltimore, Maryland, has a thorough education and had extensive experience in the supervision, maintenance, and repair of many types of vessels, in making surveys and the preparation of repair specifications, as well as the inspection of fishing vessels, yachts, steamships, and motor vessels. He made a survey of the specifications, the construction, and the material used as shown by the description outlined in the contract and specifications. He apparently had never seen the boats nor the materials. He gave as his opinion that the market value of the 11 boats, 10 of which were not entirely completed, was $90,064. There is no showing that he was familiar with the exacting requirements and heavier construction required for the Navy personnel boats. He seemed not at all bothered by the fact that the Government had advanced in progress payments more than $141,000 to the contractor.

The other defense expert was Captain Bernard W. Davis, a naval architect, who was at the time head of the Landing Ships, Boats and Amphibians Branch of the Design, Shipbuilding and Fleet Maintenance Division of the Bureau of Ships. This branch supervised the technical performance of contracts for the construction of a large variety of water craft, including 40-foot personnel boats. He asserted that he was familiar with the plans and specifications under the contract in question. He had had 20 years' experience with all types of Navy ships. He testified that the ships completed and uncompleted at the time of taking would have a market value of $90,000. He added that in his opinion the total value of the extra materials which plaintiff had furnished would not exceed $4,000. He gave as his opinion that the commercial market of the entire property was worth substantially less than the amount of the progress payment

made by the Government to the Rice Shipbuilding Company.

It seems passing strange that the unused materials, consisting of more than 400 items, which the experienced Rice Shipbuilding Company had purchased at a cost of more than $21,000, when not a nail had been driven, nor a hammer sounded, had suddenly become worth only $4,000. Nor did he seem to be deterred by the fact that other officials of the Government had contracted to pay $175,900 and that the ships were so far along in construction that they were from 73 percent to 97 percent completed; that one of them was completed entirely and that the Government had already made progress payments of $141,000 on these ships.

The plaintiffs presented the testimony of Barry Kingman, the owner of the T. Barry Kingman Marine Construction of Massachusetts. He stated that he was fully familiar with the value of Navy 40-foot personnel boats during the period 1952–1956; that he had been in the small boat construction business for 28 years; that he visited the boatyard of Rice Shipbuilding Corporation during the period of time when it was constructing the 40-foot personnel boats, and that the Rice Shipbuilding Corporation had subcontracted its requirement for distribution panels through him. He had also had experience in constructing 24 40-foot personnel boats for the Government. He stated that he had examined the schedule of the completion of the boats and that from his knowledge of the cost of the boats and the Government's requirements and value at the time of their taking in their uncompleted state was $250,800; that these boats had a very limited market "because they were too ruggedly and expensively constructed for normal pleasure boating requirements."

Another affidavit was furnished by Frank L. Sample, Jr., of Maine, who had been in the business of building and repairing small boats from 20 feet to 180 feet for 23 years. He stated that he had personally handled a number of Bureau of Ships small boats contracts and knew of "their exacting requirements for both workmanship and materials." He stated that he was familiar with the Navy 40-foot personnel boats involved here; that he had contemplated submitting a bid for these same boats, and that he had examined the specifications and made preliminary calculations as to labor and materials for the construction. He stated that the type of construction required for Navy boats would increase their useful life and enhance their value. He stated as his information that the Rice Shipbuilding Corporation had expended in the performance of its contract the sum of more than $198,000; and based upon his knowledge of the usual workmanship by all yards in the Boothbay area, where his company was located, and in the same area in which the ships had been built, that while there was no normal market value based on the sales of this type of boat, it did have considerable value for heavy-duty commercial use. The value in his opinion would be the replacement cost less depreciation; and that since these boats were new construction, depreciation would not be a factor. Based upon the various facts which he outlined, he gave it as his opinion that the boats and materials had a value in 1955 of $247,470.

The affidavit of Harry Town, an expert in shipbuilding, was along similar lines.

We were somewhat confused when we started reading these affidavits and now our confusion covers a wider range, and yet somewhere between these wide-ranging expert opinions must be found the facts of life. Fortunately, we have a number of other factors which will aid us in reaching a just conclusion.

There is no doubt from the record that Navy officials who negotiated the contracts had had wide experience in contracting for boats of this type. They contracted to pay $175,900. There is practically no dispute that the shipbuilding corporation had spent nearly $200,000 before the contracts were terminated. There is not the slightest doubt

that the Government advanced in progress payments more than $141,000. We have no doubt from the disclosed, admitted, and proven facts that there was no ready market for this heavy type of boat construction outside the demands of the Government. A reading of the record also discloses that it would require considerable alteration to transpose these heavy boats to the type of boat suited for passenger and pleasure operation of which the outside market largely consisted. Then, too, there was probably not a great market for unfinished boats any more than there would be a general market for a suit of clothes with just one leg of the trousers finished, even though the remaining material were furnished with the partially finished suit of clothes.

We could refer this case to a trial commissioner for the taking of further testimony as to values, but we can see no good purpose in doing so. The facts arose 7 years ago. We would finally have to depend to a considerable degree upon the testimony of experts which would probably vary very little, if in any material way, from the testimony already given. We have all the other collateral and essential facts that would be available. In addition, it would involve considerable time and expense to both court and litigants. The case involves 27 plaintiffs and 444 items of material. Most of the different amounts claimed are small and the total is only $21,533.23. The aggregate claims of the plaintiffs totaled some $23,000 originally, the defendant's auditors objected to four small items. As to two of these, the adjustments suggested by the defendant were accepted. As to the other two items—$51.51 and $75.18—which the plaintiffs refused to accept, the president of Rice stated in his affidavit that these materials were supplied to these companies for use on the subject boats. The trustee in the bankruptcy proceeding of the Rice Company also stated in an affidavit that after investigation he had accepted these items as true and correct. In the circumstances we find the affidavits sufficient. So there is no substantial issue as to the value of the unused materials furnished. We find that value to be $21,533.23, the net amount stated above.

There is a fable recited in the Talmud to the effect that a wolf went into a field and stole a sheep. The shepherd ran and caught up with the wolf and seized the sheep, pulled it toward him. "The shepherd pulled this way, the wolf pulled that way, and between them the poor sheep was torn in two."

Further hearings and litigation would tend to eat up the substance of these claims.[1] In the range country, I knew an old timer who undertook to whittle out a toy horse for his boy. In his effort to make it perfect he whittled it entirely away. There should be an end to this litigation. The case has been heard twice by this court. It has been decided by the Supreme Court, which Court has clearly set out the formula by which the conclusion should be reached. We have enough facts to justify us in finding that while there was no general market sufficient to justify a finding of market value, the actual and intrinsic value of the ships, plus the value of the unused materials at the time of the taking, was substantially more than $21,533.23 in excess of the $141,000 which the defendant had made in progress payments. From the record as a whole we so find.

[1]. The famous case of Burden v. Hornsby, 50 Mo. 238, was a suit for damages for killing a dog, "Old Drum." The suit was for the sum of $50. It was tried four times, verdicts set aside and two appeals taken. Attorneys were changed. George G. Vest (later United States Senator) paid a noted tribute to the dog. A final verdict of $50 was entered. In the meantime the dog had died but the suit lived on, the total court costs and attorneys fees being far in excess of the value of the dog.

The one man who seemed to have gained an advantage from the long-drawn-out litigation was George Vest, then a young attorney, who achieved national fame through his tribute to the dog.

The plaintiffs are entitled to judgment in the amounts set out below, together with interest on said amounts as part of just compensation at the rate of 4 per cent per annum from August 4, 1955, to date of payment:

Cecil W. Armstrong and Marie I. Armstrong, co-partners d/b/a Armstrong Products Company................. $ 134.30
Baltimore Copper Paint Co., a division of Oliver Reeder and Son, Inc........................................ 153.00
Orrin F. Benner d/b/a Thomaston Steel Works.......... 477.78
Mason C. Carter..................................... 316.47
Chase Brass & Copper Co............................. 30.58
Columbian Bronze Corp............................... 227.48
Maurice W. Dennison, Thomas G. Lynah and Charles J. Winkler, Jr., Trustees d/b/a Braman, Dow & Co........ 442.57
The Dexolium Corporation............................ 529.37
Heywood-Wakefield Company........................... 320.00
E. F. Hutchinson, d/b/a Ned's Garage................. 51.51
Kainer & Company................................... 1,876.67
O. O. Keiver Lumber Corp............................ 1,346.24
Kennebec Wharf & Coal Company, a division of Staples Coal Company.......................................... 211.19
Hiema J. Kuhls, Anna Kuhls Yates, Gladys Kuhls Woodel and Frieda Kuhls Woodel, co-partners d/b/a H. B. Fred Kuhls........................................... 115.98
Le John Manufacturing Company....................... 1,320.00
Marine Service Inc................................. 402.33
Marshall & Company, Inc............................ 165.63
Richardson, Dana & Co., Inc......................... 784.70
Alfred B. Sherman, d/b/a as Campbell-Built Products...... 89.46
The Southington Hardware Manufacturing Company...... 334.80
Surrette Storage Battery Co., Inc.................... 1,298.00
W. & J. Tiebout, Inc............................... 2,857.56
Kenneth M. Walbridge and Robert P. Walbridge, co-partners d/b/a Walbridge Bros............................. 75.18
Wilcox-Crittenden Division of North & Judd Manufacturing Co............................................. 403.26
Winde-McCormick Lumber Company.................... 6,221.37
Wickwire Spencer Steel Division, The Colorado Fuel and Iron Corporation................................. 1,187.42
Maximilian P. Wurf, d/b/a Transplastics Fabricating Co.. 160.38

It is so ordered.

FAHY, Circuit Judge, sitting by designation, and DURFEE, LARAMORE and MADDEN, Judges, concur.