Dureee, Judge,
delivered the opinion of the court:
This is a suit for damages for production losses which plaintiff claims resulted from its contract in 1950 with the United States Signal Corps to manufacture 6,000 radiosondes. The radiosonde is a radio transmitter used for transmitting coded signals as to pressure, temperature and humidity of the atmosphere through which the instrument descends by parachute when dropped from an airplane.
Having experienced considerable difficulty in the performance of the contract, plaintiff sought an equitable adjustment in price from the contracting officer because of alleged defects in the specifications. His denial of this claim was later affirmed upon appeal to the Armed Services Board of Contract Appeals, except that it allowed an equitable adjustment in price for increased costs for one item, “the 27-hair humidity element.” This one issue was remanded to the contracting officer to determine the amount owing plaintiff on this item, but there is no record of any further action.
On July 22, 1960 this court ordered stricken the defense alleged by the Government in this action that plaintiff had failed to exhaust its administrative remedy. The court also instructed plaintiff to proceed with the remainder of its administrative remedy and with this suit.
Plaintiff alleges three counts for recovery. The first count alleges these misrepresentations by defendant in the specifications :
(1) That the radiosondes had been adequately engineered for production.
*599 (2) That this equipment could be mass-produced.
(3) That the components had precise specifications and were completely standardized and reliable, and
(4) These components and the model radiosonde furnished by defendant could be used by plaintiff as a standard of performance and without hindering its performance of the contract.
There can be no recovery on this first count because the evidence fails to establish that defendant expressly or impliedly made these alleged misrepresentations. Plaintiff was advised by defendant prior to the contract that the radiosonde unit was complex and difficult to produce, and that considerable manufacturing expertise in this type of production would be required. Plaintiff had no prior experience in this particular type of manufacture of a complex and difficult instrument. As a result of this lack of experience in producing comparable items, plaintiff mistakenly appraised this project as a routine assembly job, and as a consequence, encountered constant difficulties in manufacture, such as improper adjustment of pickup arms, improper installation of motors and intraplant personnel problems and turnover.
Alternatively, plaintiff seeks to recover in its second count the same additional costs and damages alleged in its first count, under the “Changes” clause in the contract, which provides for equitable adjustment and modification of the contract prices. This claim for equitable adjustment was previously denied by the contracting officer. The Armed Services Board of Contract Appeals affirmed the decision of the contracting officer, except that the Board allowed equitable adjustment in price for increased costs of one item, the “27-hair humidity element.” This one item was remanded to the contracting officer to determine the amount owing plaintiff thereon. This remand was later confirmed by the Board, but there is no record of any further action or determination.
We conclude that the Armed Services Board of Contract Appeals had proper cognizance of plaintiff’s appeal under the contract as herein alleged in plaintiff’s second count under the “Changes” clause in the contract. We have already found that the evidence does not establish plaintiff’s present *600 claims as to misrepresentation. We further conclude that the decision of the Board was not arbitrary or capricious and was supported by substantial evidence.
On July 22, 1960 the court in this case granted plaintiff’s motion to strike the defense concerning plaintiff’s failure to exhaust its administrative remedies and instructed plaintiff to prosecute both the remainder of its administrative remedy before the Armed Services Board of Contract Appeals, and also the instant suit before the court. This remainder of the administrative remedy is the determination of increased costs of the “27-hair humidity element” of the radiosonde under the “Changes” article in the contract, as directed by the Armed Services Board of Contract Appeals. The record does not divulge any specific action by either party relative to compliance with the order of the court made over two years ago to proceed with this part of the administrative remedy. In view of this unexplained delay and to eliminate further confusion in deciding the rights of both parties as to this one issue, we conclude that defendant is liable for equitable adjustment of the contract price for increased costs incurred in connection with the 27-hair humidity element of the radiosondes manufactured by plaintiff pursuant to the contract, and section E-7 of the specifications as modified. We shall not require further administrative procedure. Reinking v. United States, 151 Ct. Cl. 307, 283 F. 2d 527, and Cecil W. Armstrong v. United States, 152 Ct. Cl. 731, 287 F. 2d 577, rev'd, 364 U.S. 40.
In its third count, plaintiff seeks to recover a one percent discount deducted by the Government from the entire contract price as provided in a subsequent modification of the contract. This modification of the contract provided for an advance partial payment by defendant at the rate of 90 percent of direct material costs in consideration of a one percent reduction in the total contract price. Plaintiff contends that the discount was not properly deductible from the contract price because defendant did not make all of the partial payments required under the modification of the contract. Plaintiff’s appeal to the Armed Services Board of Contract Appeals protesting the deduction of this discount was denied on the ground that the discount was “an unquali- *601 fled reduction in the contract price.” We find Chat this decision by the Board was supported by substantial evidence and was not arbitrary or capricious. The evidence does not establish that any delay by defendant in making partial payments under this modification of the contract was a wrongful breach of the contract, but was attributable to defendant’s difficulties in processing and auditing plaintiff’s invoices.
Defendant contends that the entire contract was performed by a subcontractor, The Wilcox-Gay Corporation of Charlotte, Michigan; that there is no evidence that plaintiff paid that subcontractor any part of its losses, or that plaintiff is liable to the subcontractor for such losses, and therefore plaintiff is not entitled to recover under the “Severin doctrine,” Severin v United States, 99 Ct. Cl. 435 (cert. denied 322 U.S. 733).
The subcontract is not in evidence and there is no evidence as to whether or not plaintiff is liable to the subcontractor for losses. In J. W. Bateson Company, Inc. v. United States, 143 Ct. Cl. 228, this court said, at p. 229:
“* * * a prime contractor may bring suit on behalf of the subcontractor where the contract between those parties does not negate liability for increased costs occasioned by the acts of the Government. * * *”
See also Barnard-Curtiss Co. v. United States, 157 Ct. Cl. 103, and J. L. Simmons Co. v. United States, ante, p. 393.
In the absence of any proof of an exculpatory provision in the subcontract, we conclude that plaintiff is entitled to maintain this action as to the equitable adjustment of the contract price for increased costs incurred in connection with the “27-hair humidity element” of the radiosondes manufactured by plaintiff, as allowed by the Armed Services Board of Contract Appeals.
Judgment will be entered for plaintiff as to this one claim, with the amount of recovery to be determined pursuant to Rule 38(c).
As to all other claims or counts alleged by plaintiff, the petition will be dismissed.
It is so ordered.
Davis, Judge; Laramore, Judge; Whitaker, Judge; and Jones. Chief Judge, concur.
*602 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff. — Plaintiff is and at all material times was a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.
2. Separation of issues. — The claim is being reported to the court on the limited issue of liability pursuant to stipulation of the parties approved by the commissioner.
3. The contract. — On March 22, 1950, the Signal Corps Procurement Agency, Department of the Army, issued an invitation for bids to manufacture in accordance with Government specifications, 6,000 radiosondes, designated AN/AMT-3. The plaintiff was the low bidder and, after it verified its unit price of $76.42 on May 3,1950, it was awarded Contract DA 36-039-SC-1473 at a total contract price of $458,670, subject to time discounts. Deliveries were to start in December 1950 and were to be completed in March 1951.
4. The radiosonde. — The AN/AMT-3 radiosonde is a radio transmitter used for meteorological soundings of a vertical column of the atmosphere. It is affixed to a parachute and is dropped from a weather reconnaissance airplane while in flight. While descending it transmits signals in Morse Code which are either received in the airplane from which the radiosonde was released or by another receiver within range of the transmitter. The coded signals indicate the pressure, temperature and humidity of the column of air through which the radiosonde is passing. Three sensing elements, for pressure, temperature and humidity, are linked mechanically to pickups which move laterally across the face of a record with changes in the atmosphere. The record is a plastic disc which has been impressed with a sequence of two-letter groups of Morse Code characters. As the record is driven by an electric motor, the pickup impulses actuate a relay which keys the transmitter. This equipment was described as a “one-shot” item because no efforts were made to recover it after use.
*603 5. Developmental haclcgroimd. — In late 1942 or early 1943 Harrison B. Brailsford, a qualified electronics engineer in the field of acoustical instruments, was requested by the Signal Corps to develop a pickup arm for use in the development of an instrument of the type in suit. Brailsford designed and built the first working model of the radiosonde, and performed two development contracts to perfect the instrument. In late 1944 he completed the first production contract awarded covering production of 400 or 500 instruments. The end of hostilities in World War II interrupted the completion of his second production contract for the unit, in the course of which a daily production of 25 units was attained. In 1947, the Signal Corps wrote a set of specifications for the unit. In June 1947 the Washington Institute of Technology, Inc. (hereafter w.i.t.) was awarded a contract for 12,000 units (increased by 4,425 additional units in March 1948), and the contracts were completed in the last half of 1948, although not without production difficulties. At this time w.i.t. did not consider the radiosonde design to be suitable for mass production. Most of the technical problems encountered by w.i.t. in the manufacture of the radiosonde under its contracts were of the same nature as those encountered by the plaintiff in its subsequent production under the contracts in suit. The instrument produced by w.i.t., one of which became the Government supplied model for plaintiff’s bid, was not wholly satisfactory in performing its function and incorporated some insubstantial changes over the earlier Brailsford unit which permitted a reduction in manufacturing costs.
6. The Air Force and the Signal Corps considered the subject equipment to be of a “marginal” or “interim” nature, i.e., not entirely satisfactory but usable until something better was developed. It was easily susceptible to damage from improper handling, packing, storage, transportation and launching. Operating instructions directed the unpacking of double the number of radiosondes required'for a contemplated weather reconnaissance flight so that there would be no delay if defective or inoperable instruments should be found. A large number of unsatisfactory reports as to fail-, ures in the field were received from the using agencies of *604 the Air Force on radiosondes manufactured by w.i.t., most of them relating to damage due to handling, packing, storage, transportation and launching, reflecting a basic fragility of the equipment. Similar field experience was had with respect to radiosondes manufactured by plaintiff and by another contractor. At the time plaintiff was awarded the subject contract in 1950 the instrument was still considered to be in a development stage as opposed to a stage where it was suited for mass production. The Signal Corps was hoping to develop a more satisfactory and accurate unit. Whether it was suited for mass production in 1950 is, however, largely a question of semantics. Previous production contracts had been let and performed (see finding 5, supra). No detailed drawings were available from the Signal Corps for the benefit of manufacturers because production experience as yet was insufficient for that purpose. It is quite common that specifications in Signal Corps contracts for the production off meteorological equipment are of a performance type rather than a type giving detailed manufacturing directions.
7. (a) Specifications. — The invitation to bid incorporated Specification 74 — 117 with Amendment 6. The following selected provisions appeared in the specifications:
B-2. Function. — Eadiosonde AN/AMT-8 ( ) is released at high altitudes from a high speed airplane, and is lowered to the ground by parachute at a'rate of approximately 1200 feet per minute. The instrurqent is used to obtain data on the pressure, temperature and relative humidity of the atmosphere between the height at release and the earth. Measurements of these conditions are made by the instrument and transmitted in International Morse Code symbols to a receiver in an airplane.
* * * * *
C-l. Material, General. — Except as otherwise stated herein, the material shall be as in the model.
H¡ ‡ ' ‡ # $
C-5. Substitutions for Specified Products. — If the bidder desires to substitute another material or fabricated part in those cases where the specification or drawings call for the product of a specific manufacturer “or equal”, he shall submit a statement to that effect with *605 Ms bid, describing the proposed substitutions; and shall submit data that will substantiate his claim that such substitutes are the equal of the specified products. At the discretion of the contracting officer, samples may be required which will demonstrate by test the suitability of the proposed substitute.
C-6. Workmanship. — All parts shall be manufactured and finished in a thorougMy workmanlike manner. The quality of workmanship shall be at least equal to that used in the model. All parts shall fit and operate in a good, workmanlike manner.
$ ‡ $
D-l. Model. — All materials and parts in the equipment shall be identical with those used in the model, unless otherwise required in this specification (explicitly or by implication) or when specific approval to substitute other materials or parts is obtained from the contracting officer. Unless exceptional circumstances exist, substitutions will be allowed only if the substitute materials or parts are electrically and mechanically interchangeable with those used in the model. Mechanical and electrical interchangeability shall not necessarily be taken to mean or to require that the corresponding materials or part be identical.
D-la. Availability of Model. — The model will be available for inspection by prospective bidders. It will be lent to the contractor for the duration of the contract and shall be returned in good condition at the completion thereof. The right is reserved for authorized representatives of the contracting officer to check the model at any time while it is in the possession of the contractor or his subcontractor.
D-lb. Verification Measurements. — When the model is received by the contractor he shall conduct all measurements necessary to verify its performance. Before making the measurements, the model shall be returned and/or realigned by the contractor as necessary to obtain optimum performance. The contracting officer shall be notified sufficiently in advance so that his authorized representative can witness the measurements. The measurement data shall be recorded and 3 copies thereof shall be furnished to the contracting officer to serve thereafter as sufficient verification of the performance of the model. If the verification measurements indicate that the model does not_ meet specified performance, the contractor shall immediately so notify the contracting officer.
*606 E-l. Construction.- — All construction shall be in accordance with the model except as otherwise required or allowed by this specification, and shall be such that the equipment meets the tests given in section F.
E-2. Functional Operation. — The radiosonde covered by this specification is of the general class of radio telemeters in which the position of the lever arms actuated by pressure, temperature, and humidity responsive elements, respectively, is measured by contacting devices that automatically key a radio transmitter with a unique coded signal, representative of the position of the lever arms. The coded signal is generated by pick-up elements which are guided into the grooves of a code disc similar to a small phonograph disc with each revolution of the code disc. Each groove of the disc is impressed with a modulation of a two-letter combination of International Morse Code letters. The disc is driven by a permanent magnet electric motor. The code transcribed by the three meteorological elements is transmitted in sequence as a single message in the following order: pressure, temperature, and humidity. The instrument is housed in a case in which the temperature and humidity elements can be adequately ventilated. The equipment is provided with an automatic release device which opens the parachute in y2 to 3 seconds, (depending on the setting) after the radiosonde is released from the plane.
# i]í Í& ífc ijS
E-7. Humidity Element.
E-7a. Humidity Responsive Material. — The humidity element shall be Hair Element Type No. 511824-1 as made by the Friez Instrument Division of Bendix Aviation Corp., Baltimore, Md., or equal.[1]
E-7b. Linlcs and Levers. — The lever system for the humidity element shall be adequately spring loaded. The shaft and bearings of the lever system shall operate freely at all temperatures in the operating range of the instrument.
E-7c. Performance Characteristics.
E-7c(l). Range. — The range of operation of the humidity element shall be from 15 to 100 percent R.H. in the temperature range +40 to —20 C.
*607 E-7c(2). Sensitivity. — The movement of the humidity element lever arm across the code disc shall be such that each groove in the disc shall represent a relative humidity interval of 3 ± 2 percent R.H.
E-7c(3). Accuracy. — The humidity element shall repeat the original calibration within ±5 percent R.H. throughout the operating range of the element at temperatures above 0 C and within ±12 percent R.H. at temperatures between 0 C and —20 C, when tested as described in paragraphs F-lOc and F-13d.
E-7c (4). Shock. — When subjected to the shock test of paragraph F-13b, the humidity element calibration shall not be displaced by more than ± 3 percent R.H.
E-7c(5). Vibration. — The humidity element system shall meet all the applicable requirements of this specification after being subjected to the vibration tests. (Ref. Par. F-13a.)
E-8. Motor Assembly. — The motor assembly, as in the model, shall be Radiosonde Motor for Radiosonde AN/AMT-3 as made by Brailsford & Company, Inc., Rye, N. Y., or equal.
E-8a. Performance Characteristics.
E-8a(l). Speed. — The speed of the code disc shaft of the motor assembly shall be 7±3 revolutions per minute under all conditions of operation.[2]
E-8a(2). Power. — The motor shall operate over a range of 3.0 to 2.2 volts d-c and consume a current not greater than 30 milliamperes rms.
E-8a(3). Endurance. — The motor shall be capable of operating 10 hours without appreciable wear on the bearings or change in characteristics.
E-9. Code Pise. — The code disc shall be accurately centered on the shaft of the motor assembly so that the run-out of the concentric grooves over the 90 degrees quadrant containing the coded portion of the disc will be not greater than 0.005 inches. The center portion shall be sufficiently fiat to insure proper seating of the disc on the code disc shaft. The code disc shall be Code Disc for Radiosonde AN/AMT-3 as made by Muzak Transcriptions, Inc., or equal.[3]
E-9a. Code Sequence. — Combinations of Morse Code letters shall be impressed in the grooves of the code disc as listed in the Code Sequence Table herein.
* * * * *
*608 E-10. Code Pick-Ups. — The code pick-up elements shall be Code Pick-Up for Radiosonde AN/AMT-3 as made by Brailsford & Company, Inc., Rye, New York, or equal.
*****
E-18. Calibration Sheet. — One calibration sheet, containing calibration tables for temperature, pressure and humidity, shall be packed in the battery compartment of the radiosonde with which it is to be used. * * *.
F-7. Production Tests, General. — Component parts and complete radiosondes shall be subjected to the production tests described in paragraphs F-8 and F — 9. * * *.
F-8. Production Tests, Components.
‡ % Hí % #
F-8c. Code Disc. — Each code disc shall be visually inspected to flatness, uniformity, smoothness of the grooves, and concentricity.
* * * * *
F-9. Radiosonde AN/AMT-3 ( ) Assembly. — Each complete radiosonde shall be subjected to the following tests:
$ ‡ ‡ ‡
F-9b. Operational Tests. — Operation tests shall be made as follows:
F-9b(l). Transmitter, Picle-ups and Relay, and Record. — A receiver shall be tuned in on the transmitter to determine that signals from all three pick-ups are being transmitted clearly at the proper radio frequency.
F-9b(2). Motor. — The time for 4 complete revolutions of the record shall be measured at both 3.0 and 2.2 volts and shall conform to the requirements of paragraph E-8a(l).
Each radiosonde was to be calibrated individually and its calibration chart was to be identified and packed with the particular instrument.
(b) Disputes clause. — The contract in question contained the Disputes clause common in Government contracts:
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the contractor. *609 Within 30 days from said mailing the contractor may appeal to the Secretary of War, whose decision or that of his designated representative, representatives, or board shall be final and conclnsive upon the parties hereto. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
(c) Changes clause. — A changes clause in the contract provided as follows:
Where the supplies to be furnished are to be specially manufactured in accordance with drawings and specifications, the Contracting Officer may at any time, by a written order, and without notice to the sureties, if any, make changes in the drawings or specifications. Changes as to shipment and packing of all supplies may also be made as above provided. If such changes cause an increase or decrease in the amount due under this contract or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly, provided claim therefor is asserted at any time prior to the date of final settlement of the contract.
8. Sample unit. — Prior to the bid opening date for the subject contract, prospective bidders were invited to examine a radiosonde model unit at the Signal Corps Electronic Laboratory. Bidders were advised by Signal Corps representatives that the unit had been engineered in the sense that thousands of similar units had been produced both in development and production stages in preceding years, that it was usable in the field, that it was not easy to produce, and that manufacturing “know-how” would be required because of its complex nature.
9. The subcontract. — Plaintiff, whose plant was in Brooklyn, New York, had a corporate affiliation with The Wilcox-Gay Corporation of Charlotte, Michigan. Since the Charlotte plant was considered more suitable for the purpose, actual production took place there under the direction of Wilcox-Gay. The work at Wilcox-Gay was done under subcontract with plaintiff. The subcontract is not in evidence, and there is no evidence as to whether or not the plaintiff is liable to Wilcox-Gay for any losses it may have suffered.
*610 10. Additional 'procurement. — On May 31, 1951, pursuant to an option in the contract, the defendant increased the quantity of radiosondes to be supplied under the contract from 6,000 to 7,500 units with deliveries of the additional quantities to be made in August and September 1951. On June 18, 1951, the parties entered into a negotiated contract for an additional quantity of 9,154 instruments at the unit price of $101.68, with deliveries to be made between August 1951 and J anuary 1952.
11. Plaintiff's administrative claims.
(a) In April 1952 after completion of performance, the plaintiff filed a request for relief under Title II, First War Powers Act, 1941, as amended, by reason of “government action” causing its performance losses. The application was denied and, there being no provision for appeal from such action, the plaintiff on August 17, 1953, requested the contracting officer to consider and act on the same application for relief as an application under the disputes clause of the contract. Apparently the contracting officer did not act on the plaintiff’s application, for on June 30, 1954 the Armed Services Board of Contract Appeals (hereinafter asbca) sustained the Government’s motion to dismiss the plaintiff’s appeal on the grounds that the contracting officer had not made an appealable decision, stating, inter alia, that the precise nature of the plaintiff’s application was not clear, that while it was nominally made under the disputes clause there might be some legal questions involving interpretation of specifications and there might possibly be a question of an equitable adjustment under the changes clause of the contract.
(b) The plaintiff then made application anew under the disputes clause to the contracting officer on October 4, 1954, urging that the dispute concerned questions of fact as to inconsistencies, inadequacies and errors in the specifications. On December 29, 1954, the contracting officer found that the facts did not support the plaintiff’s contentions as to the specifications, that the plaintiff’s losses were due to production problems which it should have reasonably anticipated, an intra-plant disorganization, and an improvidently low bid. The contracting officer advised the plaintiff that *611 it could appeal to the Secretary of the Army under the disputes clause if in its opinion the findings and decision of the contracting officer involved questions of fact.
(c) The plaintiff on January 28,1955 filed its appeal with the Secretary of the Army, again stressing its “opinion that the facts involved in this appeal as well as the Findings and Decision above referred to involve a dispute concerning questions of fact under the contract such as contemplated by the provisions of Condition 14 of the subject contract.” Count I in its complaint in that proceeding related to unearned discounts, and Count II related to mutual mistake or misrepresentation upon the part of the Government. The Government filed a motion to dismiss Count II of the complaint because it amounted to a claim for reformation of the contract and as such was beyond the jurisdiction of the asbca (designee of the head of the department) under the disputes clause of the contract. The plaintiff filed a perfunctory two-paragraph opposition to the motion to dismiss. On December 20, 1955, the asbca denied the Government’s motion to dismiss Count II, stating in part:
On 31 October 1955 the Government filed a motion to dismiss the appellant’s second claim upon the ground that it is clearly a request for reformation of the contract because of an alleged mutual mistake or misrepresentation of material facts and that such relief is beyond the jurisdiction of the Board. The parties have concurred in a request that the motion be decided on the record without an oral hearing.
While the complaint requests the amendment of the contract because of misrepresentations or mistakes of the Government, it alleges that the specifications were defective and that the appellant was required to perform work which otherwise would have been unnecessary.
The Court of Claims has recently stated that a contractor’s failure to analyze with great nicety the appropriate theory for its claim should not have the effect of a forfeiture. John A. Johnson Contracting Corp. v. United States, Ct. Cl. No. 47607, 12 July 1955, 132 F. Supp. 698 [132 Ct. Cl. 645].
For the purposes of this motion we have assumed the appellant’s allegations to be true. It may be that upon a hearing on the merits the evidence will not establish that there was in fact any change in the specifi *612 cations but, as a matter of pleading, we hold that the complaint alleges facts which would authorize the granting of relief by the Board under the “Changes” article.
(d) On seven days in May and June 1957 the asbca heard testimony in the case from 11 witnesses covering 978 pages of transcript, considered 55 exhibits, and had available for consideration voluminous documentation submitted by the contracting officer. The asbca, on December 31,1958, denied plaintiff’s appeal in all respects save “equitable adjustment of the contract price for increased costs incurred in connection with the 27-hair humidity element”, which issue was remanded to the contracting officer for negotiation of the amount due the plaintiff. At .the outset of its findings and decision the asbca stated:
This is an appeal from a decision denying a claim for $820,604.04 as an equitable adjustment of the contract price pursuant to the “Changes” article.
The plaintiff contends in this court that asbca ignored the theory of plaintiff’s complaint (i.e., mutual mistake or misrepresentation on the part of the Government) because it had no jurisdiction to consider it, and decided the claim on the theory of equitable adjustment under the changes clause, which lies within the jurisdiction of the Board but which plaintiff had not urged or relied on. In its requests for findings of fact the defendant requests there be found the unabridged text of the asbca’s lengthy opinion and decision, but this report- of the facts will make reference to the asbca opinion and decision only where and if it is relevant to a consideration of component parts of the claim.
- (e) The plaintiff filed a motion administratively on January 22, 1959 for clarification of the decision of the asbca as to the área and amount allowable as an equitable adjustment for that part of the appeal sustained by the asbca. There was pending at the same time the Government’s motion for reconsideration of that part of the decision allowing plaintiff’s appeal in part. Both motions were denied by the asbca on February 1, 1960. -
12. Proceedings subsequent to institution of instant suit. — • At the instance of plaintiff proceedings in this court were *613 suspended from immediately after the filing of the petition in January 1958, to February 1960. Then the defendant moved for a six-month extension of time to file its answer to the petition on the grounds that plaintiff had not submitted data to the contracting officer in support of the item of the claim which the asbca had remanded. The court denied this motion, ordering plaintiff to file an amended petition within 30 days and the defendant to respond within 45 days thereafter. In its answer to the amended petition the defendant pleaded as an affirmative defense the plaintiff’s failure to exhaust its administrative remedies with respect to that part of its claim remanded to the contracting officer by the asbca. On July 22,1960, the court, without oral argument, granted plaintiff’s motion to strike the defense concerning failure to exhaust administrative remedies, and instructed the plaintiff to prosecute both the remainder of its administrative remedy and the instant suit. There is no evidence that appears in the formal record that plaintiff has complied with the direction that it proceed simultaneously to exhaust the remainder of its administrative remedy. The administrative proceeding has not formally terminated.
13. Finality of the A8B0A decision. — (a) At a duly called pretrial conference plaintiff announced its decision to “rest its case in chief on the issue of liability on the contents of the administrative record”, and the parties stipulated that if the witnesses who testified in the hearings before the asbca were called in this action they would testify as they did in the Board proceedings, “and that exhibits, etc., of the Board be received in the instant case as evidence, etc.”. The entire administrative record is in evidence in this action in the form of Joint Exhibits, with an immaterial exception. The plaintiff offered no further evidence in the trial in this court, and the sole fresh evidence offered by defendant concerned that part of the administrative claim which the asbca had resolved in the plaintiff’s favor relating to the hair humidity element. In addition the record contains stipulations of fact between the parties in the form of notices to admit and responses thereto which are predicated largely on findings appearing in the December 31,1958 opinion and decision by the asbca.
*614 14. Verification measurements. — Section D-lb of the specifications relating to verification measurements is quoted in finding 7, supra. The plaintiff lacked the necessary-equipment to perform verification measurements on the government-furnished model radiosonde as required by the quoted specification and was granted permission to use the facilities of the Signal Corps laboratory for that purpose. During these tests at the Signal Corps laboratory the model unit would not transmit an audible, intelligible code signal at low temperatures prescribed by the specifications. The Signal Corps conceded that the model did not function properly and attributed its defects to excessive handling. The Signal Corps then drew an additional six model units from stock in order to select one as being most representative of specification requirements. In none of these models was the quality of the code signal perfectly clear, but in order not to delay production the best of the lot was selected on October 9, 1950, as a production model, with the plaintiff’s request that the Signal Corps clarify at a later date the “permissible degree of garbling”.

The Proprietary Components

15. The specifications contemplated that the plaintiff was to use the production model furnished by the defendant as a standard for performance. Materials used were to be as in the model unless otherwise stated in the specifications, and workmanship was to be at least equal to the model. The specifications required the use of designated commercial products “or equal” for the sealing material for range adjustment screw, bi-metal temperature responsive element, humidity element, motor assembly, code disc, code pickup elements, relay, parachute assembly, parachute release device, and antenna. The names and locations of the manufacturers of the foregoing commercial components were given in the specifications. Remaining components were required by the specifications to comply with particular joint Army-Navy (JAN) specifications and Army specifications.
16. The extent to which the specifications. describe the physical and performance characteristics of those of the foregoing commercial components which were involved in *615 the plaintiff’s particular production difficulties can be ascertained from those specifications set forth in finding 7(a), supra. In the course of the administrative proceedings the Government admitted that certain of the commercial items “were subject to modification or change by the manufacturers thereof and that no drawings or specifications were available from the Government by which the appellant could verify materials delivered to it by the manufacturers.” If for no other reason the time element for submission of bids would have effectively prevented bidders from basing their bids in part on proprietary components which were “equal” to the ones designated by type and manufacturer in the specifications.
17. The specifications provided that the motor assemblies, pickups and discs were to be as made by Brailsford & Company, Inc., or equal. Brailsford held patents on the motor and pickup and, in the absence of a licensing agreement, refused to give drawings in sufficient detail to permit reproduction of the components. Brailsford did supply plaintiff with certain drawings of the radiosonde which would have enabled plaintiff to use the components but not to manufacture them. These drawings showed parts and subassem-blies, dimensions, tolerances, and the manner in which the instruments were to be assembled.
18. On December 6, 1951, Mr. Litinsky, the contracting officer’s representative, visited the plaintiff’s plant to determine the cause for a production slowdown, 5,643 units having by then been delivered. His report contains the following observations:
1. The quality of Brailsford parts, especially pickup arms and discs, is such that many of the parts are rejected before use and in many cases they must be removed for further repair or replacement after assembled in the units. Pick-up arms have been replaced in assembled units two to five times before satisfactory operation is obtained from the radiosondes. Since these are apparently according to Brailsford’s specifications and because the Contractor does not know what the Brailsford specifications are, the problem has been turned over to the Engineering Department to determine whether it is the pick-up arms or discs that are causing the final rejects. From a lot of 1440 recent *616 pick-up arms 1,025 were accepted before assembly and the unusable ones were classified as follows:
3 arms of specified total were not received
1 needle missing
2 clappers missing
6 broken springs
6 weak clappers and needle springs
12 loose rivets
12 clappers soldered crooked
16 miscellaneous
17 loose clappers
42 needle springs soldered crooked
251 needles soldered crooked
47 incorrect soldering of needles
This means that 29% rejects were experienced before assembly and 150% rejects resulted after assembly of the balance. Of the latter, rejects may have been reworked for later use.
»«» ^
C. RECTIFYING ACTION FOR SLOW DOWN
1. Wilcox-Gay has no specifications according to the manner in which Brailsford constructs his parts and have been unable to obtain same from Brailsford. Wilcox-Gay is requesting the assistance of Signal Corps in obtaining such specifications by letter, according to which they can determine a reject point on the deliveries from Brailsford Company. Even then, it is possible that items according to Brailsford specifications will not be suitable for use in obtaining the proper performance in the end item. Eor this reason, Wilcox-Gay is setting up their own specifications to concur with the type of parts required for satisfactory end item performance. Brailsford claims that the items being supplied should function properly. He was requested to come to Charlotte, Michigan at Wilcox-Gay’s expense to assist in resolving the problem in which he advised that it was not possible at this time, especially since he was making a trip to California in the near future. Hereto, Wilcox-Gay has requested the Signal Corps to approve of [illegible word] up second sources for these items and this condition has been referred to the attention of the Contracting Officer previously.
* 4 4 4 *
E. SUPPLY OP MATERIAL
4 4 4 - 4 4
3. The flow of material is good. Although the flow of Brailsford parts is good in quantity at present, it’s *617 poor quality makes this the factor requiring close observation.
*****
6. ADDITIONAL SOURCE OK SUPPLY
1. Wilcox-Gay desires to develop second sources of supply for Brailsford items due to the prevailing conditions. Mr. Langford, who enjoys considerable experience from a legal and patent point of view, made a careful study of Brailsford claims and is of the opinion that equal or better units can be constructed without licensing. He went as far as to inform possible suppliers that he would assume responsibility proceeding with such work and freedom from patent infringement.
Many of plaintiff’s production problems involved the interrelation among the code disc, pickup and motor which were components supplied by Brailsford. The speed of the motor and the adjustment of the pickups to the face of the disc are critical factors for the proper operation of the instrument. The motor must rotate the disc fast enough to assure intelligible signals at very low temperatures which adversely affect the efficiency both of the motor and of the batteries. The pickups must be mechanically linked to the sensing elements and adjusted so that they will accurately track in the proper groove of the disc. Thus each of these components constituted a possible variable in the proper functioning of the assembled instrument.

Code discs

19. In performing its earlier contract for the radiosonde, w.i.t. (finding 5, sufra) used the Brailsford plastic disc which tended to warp downward at the edges in low temperatures. Brailsford had a development contract with the Signal Corps in 1948 or 1949 to develop a new design for the disc so as to overcome its warpage at low temperatures and to prevent “sagging” of the plastic in storage at high temperatures for protracted periods. The newly designed disc had a perforated aluminum case or backing which, while it was a better disc for manufacturers of radiosondes to employ, had a tendency to warp upwards at the edges in low temperatures. A disc free from such distortions would produce a clearer signal and necessitate less compensatory ad *618 justment in the pickup arm. w.i.t. bad experienced continuous production problems in using the earlier type disc, had damaged several thousands of them beyond use because of their inherent characteristics, and had been required to make individual adjustments to each unit of production to compensate for distortions. At the time of the award of the first contract in suit to the plaintiff the Signal Corps had just received the newly designed discs from Brailsford and was testing them. The model instrument furnished the plaintiff for reproduction had been manufactured by w.i.t but the disc had been replaced with one of the new Brailsford design. Use of the new type disc was optional with plaintiff, but the Signal Corps felt that it would facilitate production.
20. Brailsford manufactured discs with four degrees of modulation or depth of grooves and the disc originally supplied had the maximum modulation which also created the greatest vibration and provided the widest range of operation. The plaintiff complained that the high modulation discs caused the pickup arms to hop from one groove on the disc to another. The evidence does not clearly establish whether this groove-hopping was caused by the high modulation disc, or by manufacturing errors attributable to the plaintiff as contended by Mr. Brailsford. However, Brails-ford voluntarily replaced 4,344 high modulation discs with low modulation discs. This situation occurred largely during plaintiff’s pilot run in April 1951. Difficulty with the high modulation discs could not be determined until many of them had been assembled into completed instruments and subjected to tests, resulting in some delay at the outset of production. The pilot run referred to involved production of the first 1,000 instruments of the total 6,000 under the first contract.
21. The specification required tests of the radiosonde to be performed at a — 50° C. temperature. The distortion of the edges of plastic discs at that temperature is a normal phenomenon and caused a large part of plaintiff’s difficulties. Plaintiff therefore sought and obtained permission to place a reinforcing aluminum plate on the backs of the discs. On June 20, 1951, it requested this change with respect to 200 code discs. This was followed on June 28,1951, by a simi *619 lar request covering tbe remainder of the undelivered instruments. These requests were approved by the defendant immediately and the changes were subsequently formalized in Modification No. 12, dated February 20, 1952, after completion of deliveries. The supplemental agreement authorized the change with respect to 6,582 radiosondes at an increase of $0.5819 in the unit price. The price increase covered by Modification No. 12 covered only the actual increased cost required to put the discs in usable condition and did not cover the development work or the resultant effect on production and delivery of the end units while solving the warpage problem.
22. The deflection of the discs — estimated to be in the range of .020 to .025 inch — necessitated an accurate adjustment of each pickup to the face of the disc. The adjustable tolerance in the pickups, as manufactured, was in the order of .040 inch. This particular problem was alleviated, but not completely, by the addition in June 1951 of an aluminum backing to the disc as related in the preceding finding, a development which occurred during the initial pilot run of 1,000 radiosondes. Approximately, simultaneously with the plaintiff’s development and adoption of its improved disc, Brailsford developed an improved disc designed to compensate for deflections caused by temperature extremes, but his proffer of the improved disc to plaintiff was rejected in view of the plaintiff’s modification described above.
23. In its decision the asbca found as follows:
The deflection of the discs was normal and presented one of the difficulties in producing the end item. The discs with the greatest modulation would assure the widest range of operation but the appellant found them unsatisfactory for use in instruments as it constructed them.

Pickups

24. Brailsford held patents on his pickup arms (finding 17, supra) and sold them only as a part of kits including the discs, not separately. The quantity of pickups required by plaintiff made it economically unfeasible to develop an alternate source of supply, although this possibility was investigated.
*620 25. The pickup arm had to be adjusted in each individual instrument so that it would properly engage the code disc and accommodate the deflections and variations in the latter. The need to make individual adjustments to the pickup arm in each instrument would probably have been minimized if not eliminated if the code discs themselves were identical in all respects and at all temperatures, but some minor degree of deflection at low temperatures could reasonably have been anticipated by one familiar with the behavior of plastic discs at low temperatures. The degree of adj ustment of the pickup arms was controlled by the varying degrees of deflection in the code discs.
26. Part of the plaintiff’s difficulties with pickups was solved when the code discs were modified by the addition of an aluminum backing (see finding 22, supra). The correct adjustment of pickup arms was a delicate matter which was not difficult for a person such as the highly skilled Mr. Brails-ford, but presented some problems for persons on the plaintiff’s assembly lines who lacked Mr. Brailsford’s qualifications. Much of the plaintiff’s remaining difficulty with the pickup arms was attributable to its inexpert adjustment of the pickup arms which resulted in many cases in damage and distortion to their elements. Further, many of the pickup arms delivered to plaintiff by Brailsford as late as December 1951 had minor defects and omissions (see finding 19, supra), which contributed to rejections and production delays. On more than one occasion in 1951 Brailsford had advised plaintiff that its difficulties were principally attributable to mutilation of the pickup arms in the process of their adjustment, but the plaintiff continued in this procedure and, by February 4, 1952, completed deliveries. During the final two weeks of production Brailsford was hired by plaintiff as a consultant for a few days and corrected a number of defective instruments quickly and efficiently by replacing pickup arms with ones fresh from his stock, demonstrating rather conclusively that a person of his skill could utilize the Brailsford pickup arms by making adjustments in the proper manner.
*621 27. In its decision asbca found as follows:
We find that the difficulties in connection with the pickups grew out of the internal adjustments made by the appellant. If they had been assembled in radiosondes without that adjustment, their performance would have been satisfactory.

Motors

28. (a) Specifications E-8 for the motor assembly are cited in finding 7(a), supra, and included the requirement that “the speed of the code disc shaft of the motor assembly shall be — not less than 6 r.p.m., at 2.2 volts d-c for the temperature range +40 to —30° C.” Specification F-lOb, also cited in finding 7, required that the radiosonde (with, of course, the motor installed) be tested at various temperatures ranging from —50 to +30° C., plus or minus 2°. It was found in testing the radiosondes that motors stopped or slowed down to speeds less than the minimum required by the specifications. This was attributable in indeterminable degrees to a combination of causes, viz:
(1) From 2,000 to 3,000 of the motors supplied by Brails-ford by the end of May 1951 were found to be defective in that the plastic molding in the brush assemblies cracked at low temperatures. These were returned to Brailsford and replaced at his expense.
(2) Plaintiff installed many of the motors in frames which were not perfectly flat, thus causing a slight binding on the shaft and consequent friction sufficient to slow them down or stop them.
(3) The lubricant specified for use by the contract was not suitable for use at minimum temperatures.
(b) At a meeting held at plaintiff’s plant on May 29,1951, the problem of motor slowdown during cold temperature testing was discussed with the defendant’s representatives. Initially the defendant granted permission to keep the motors warm during the test and later permitted a raise in the minimum testing temperature to —40° and an increase in the voltage to 6 volts. w.i.t. had experienced low temperature motor slowdowns in the performance of its *622 earlier radiosonde contract. Low temperature operation renders batteries and motors less efficient. The motor problem was relatively a minor phase of plaintiff’s overall production troubles, and was quickly solved.
29. The Brailsford motor was patented. Another motor manufacturer approached by plaintiff was not interested both because of the patent situation, the small quantity involved, and the time factor in developing a suitable motor.
30. In its decision the asbca found as follows:
The motors, if assembled properly, would not have failed at low temperatures. Their operation was impaired because of the binding resulting from the fact that the frames were not square.
In one respect, however, some motors were deficient. This was the susceptibility of the plastic brush holders to crack at low temperatures. This defect was not the result of any insufficiency in design. In our opinion the Government did not warrant that motors would not be defective.

Humidity element

31. The element in the radiosonde which was affected by humidity was composed of strands of human hair. It was described in paragraph E-7a of the specifications as set forth in finding 7 (a), supra. The model furnished to the plaintiff by the defendant contained a hair element manufactured by w.i.t., one of the two sources specified by name in the specification.
32. The humidity element manufactured by the Friez Instrument Division of Bendix Aviation Corporation, the other of the two sources specified by name in the specifications, had 27 strands of hair, whereas the w.i.t. humidity element had 36 strands of hair. As a general rule, the tension which a given humidity element will withstand bears a theoretical direct relationship to the number of hairs in the element, and the use of more hairs will increase the amount of tension which may be applied. Actually, the lack of uniformity in hairs, the secret processing methods employed by the particular manufacturer, and the difficulty of clamping all the hairs perfectly in the element render the *623 relationship between hair count and permissible load anything but precise.
33. At the request of the plaintiff the Signal Corps conducted source inspection of the humidity elements ordered by plaintiff at the Friez plant to insure compliance with specifications and drawings for this component. This was because it was a proprietary item and it was more convenient to perform inspections using testing facilities at the Friez plant. The Friez humidity element was designed to withstand a tension of one gram per hair, or a total of 27 grams, although there was a safety factor of about 50 percent which would theoretically permit as much as a 40 gram load to be applied, assuming that each of the 27 hairs was securely and evenly clamped at either end of the element. In January 1951 the plaintiff experienced difficulty with the Friez humidity elements, particularly with hairs coming loose under humidity and tension testing, as a result of which Friez agreed to replace all humidity elements shipped to that time and to institute more rigid quality control procedures thereafter. The defendant’s engineers recognized that the hair-type humidity element was not a completely satisfactory type in all respects, but felt that it was better than any other type devised to that time for the contemplated use. They had noted some failures of the hair humidity elements in the course of testing them for use in radiosondes, but felt that institution of proper quality control in their manufacture would correct such failures.
34. On February 19, 1951, the plaintiff advised the defendant that the tension on the w.i.t. hair element contained in the model radiosonde furnished by the defendant was 125 grams,[4] while the maximum tension permissable on the Friez element was 40 grams. A deviation was requested authorizing the production of radiosondes with a reduced sensitivity in humidity indication. On March 21, 1951, the defendant granted the deviation applicable to 2,000 units. The as *624 sembly of radiosondes using a humidity element with reduced sensitivity in humidity indication required the redesign of the mechanical linkage of the humidity element which transmitted the humidity data to the code disc.
35. The w.i.t. humidity element, one of the two types designated by commercial reference in the specifications, was not available to plaintiff since w.i.t. was no longer in business. The plaintiff devised a substitute linkage to decrease the tension on the Friez 27-hair humidity element, but it was not acceptable to the defendant. However, the defendant accepted plaintiff’s alternate suggestion to substitute for the 27-hair humidity element a 36-hair element to be manufactured by Friez.
36. In a letter dated June 7, 1951, the plaintiff asked for approval of the substitution of a 36-hair element to be made by Friez and requested a unit price adjustment of $1.71, which represented an increase in price of $1.50 for the element and an allowance for administrative cost and profit. On July 19, 1951, the change was authorized when the new element was used with the original linkage system. In Modification No. 14, dated July 15, 1952, the parties agreed upon a unit price increase of $1.68, with respect to 5,634 instruments, as being fair and reasonable for the change. The modification stated that the price was increased as a result of the change set forth in Article I, which read as follows:
Article 1:5,634 each Radiosonde AN/AMT-3A, Item 1 of the Contract, will be fabricated with a 36-Hair humidity element, Friez Part No. 516788-1 using the original linkage, in lieu of the specified 27-Hair humidity element, Friez Part No. 511824r-l.
The 36-hair element made by Friez was made in accordance with a drawing dated May 28, 1951, and was designed by Friez to meet plaintiff’s requirements for an element having greater tensile strength.
37. It would have been technically feasible to have modified the linkage of the humidity element so as to use the 27-hair element made by Friez, but this would have resulted in a slightly less degree of precision than the alternative authorized by the defendant regarding the use of the 36-hair *625 element. The two types of hair elements could not be used interchangeably without modification of the linkage.
38. The price increase contained in Modification No. 14 did not compensate the plaintiff for its research and development work in developing a substitute linkage for the first 2,000 units, nor did it compensate plaintiff for any delays it may have experienced in solving the problem. In its decision the asbca found as follows:
* * * the Friez hair element specified in the contract was not suitable for use with the linkage found in the model furnished to the appellant. The contracting officer should have issued a change order directing a modification of the linkage between the humidity element and its pickup. The appellant should have an equitable adjustment of the contract price for the additional cost incurred in modifying the linkage to meet the limitations of the 27-hair Friez component. Modification No. 14 clearly presents no bar to this adjustment. The parties there adjusted the price only with respect to the increase in cost of the 36-hair element over that of the 27-hair component.
‡ #
In our opinion, the appellant is entitled to an equitable adjustment of the contract price for increased costs incurred in connection with the 27-hair humidity element. * * *.

General performance

39. Plaintiff’s pilot run of 1,000 radiosondes was commenced March 23, 1951, and completed by the end of July 1951. Deliveries, which the contract required at the monthly rate of 2,000, were completed in February 1952 in the following installments:

1951

April _ 54
May_ 324
June_ 240
•
August — ^
September tó
October . tó
November ©
December -^
1958
January .
February

*626
The discomfit claim

40. In its original form the contract in suit contained no provision for partial payments prior to delivery of completed instruments. Due to unanticipated production problems the plaintiff had expended large sums for labor costs and material purchases without recoupment, and on or about May 10, 1951, requested the defendant to modify the contract by including an article for partial payments, citing the depletion of its working capital in the round amount of $800,000. The plaintiff requested partial payments be made equivalent to 75 percent (later, on June 11, 1951, increased to 90 percent) of direct material costs. In the course of negotiations for the modification the defendant agreed to partial payments at the rate of 90 percent of direct material costs in consideration of a one percent reduction in the total contract consideration. The details of this agreement were set forth in the following relevant portions quoted from Modification No. 7 to the contract, dated June 22, 1951:
article i: The following article is hereby added to the Contract and made a part thereof:
Partial Payments. JPB 5-l¡07.2(%) — Partial payments, which are hereby defined as payments prior to delivery, on work in progress for the Government under this Contract, may be made upon the following terms and conditions:
(a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced by it for the performance of this Contract: Provided, that such partial payments shall not exceed 90 percent of the direct material costs to the Contractor of the property upon which payment is made, which costs shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer; Provided further, that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments, if any, made under this Contract, exceed 80 percent of the contract price of supplies still to be delivered.
*627 (c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained.
article n: In view of the Contractor’s offer and the Government’s acceptance of a one percent (1%) Special Discount, the total consideration of the Contract is hereby amended as follows:

From, To

$465, 780. 00 $465, 780. 00
Less 1% Time Discount_ 4,647. 80 Less 1% Special Discount_ 4, 657.80
Net Total_$461,122.20 $461,122.20
Less 1% Time Discount_ 4,611.22
$456, 510.98
41. The defendant made partial payments to plaintiff on the subject contract as follows:
(A) Plaintiff’s first invoice for a partial payment in the sum of $147,806.64, was received by the defendant on June 25, 1951; defendant made payment to plaintiff in the amount of $125,626.82 on August 21, 1951.
(B) Plaintiff’s second invoice for a partial payment in the sum of $42,405.05, was received by defendant on September 10,1951.
(C) Plaintiff’s third invoice for a partial payment in the sum of $50,080.86, was dated October 17,1951.
(D) Defendant’s second and final partial payment to plaintiff was in the amount of $44,707.90 and was received by plaintiff on December 5, 1951.
The defendant’s delay in making the foregoing partial payments was attributable to a transfer of audit responsibility from the New York office of the Army Audit Agency to its Detroit office, and in the conduct of advisory audits and processing of invoices.
*628 42. The defendant recouped its partial payments from plaintiff by withholding amounts from plaintiff’s invoices for deliveries made, as follows:
Invoice number Date payment of invoice was received Amount withheld by government as recouped partial payment Totals (aggregate)
74161. 9/13/51 $3,793.82
74162. 9/7 6,440.75
74163. 8/29 4,179.38
74165.. 10/2
74166..
74168.. 10/1
12,558.17
74167..
74169..
10/1 9,787.06
$36,759.18
74170.. 10/22
74172. 10/22
8,122.35
74171.. 10/24
74174.. 10/24
10,448.44
74176. 11/2 3,622.13
74153. 11/9
74176-, 11/9
7,294.91
74179. 11/16 10,243.08
74177. 11/19 6,647.69
74180-, 12/4 20,316.68
103,354.46
74201. 12/7 16,698.64
74181.
74182.. 1/5 15.943.82
74183.. 1/14 16,698.64
74186.. 1/28 3,663.35
[1]170,334.72
43. Following completion of the contract, plaintiff requested the contracting officer to return the one percent discount. This was denied and plaintiff appealed to the asboa. On October 29, 1958, the Board dismissed the appeal on the grounds that the special discount provided by Modification No. 7 was not a time discount but was “an unqualified reduction in the contract price”. The Board found that even if the Government delayed its payments (and this the record was inadequate to determine) the contract contained no provision for forfeiture of the discount, so that “if the appellant is entitled to any relief on that account it must be sought elsewhere.”
CONCLUSION OR LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on its claim as to *629 the equitable adjustment of the contract price for increased costs incurred in connection with the “27-hair humidity element” of the radiosondes manufactured by plaintiff, and judgment will be entered to that effect with the amount of recovery to be determined pursuant to Eule 38(c).
It is further concluded that plaintiff is not entitled to recover as to the other claims or causes of action set forth in its petition, and as to them, the petition is dismissed.

 Amendment No. 6, dated February 14, 1950, provided, in addition to the designated Friez hair element, “or hair element made for Radiosonde AN/ AMT-3 ( ) by Washington Institute of Technology, College Park, Md., or equal.” (JX-1A, p. 130)

 Amendment No. 6, dated February 14, 1950, amended the speed requirements of the motor in certain respects as is indicated in Finding 29. (JX-1A, p. 130)

 Amendment No. 6, dated February 14, 1950, changed the prescribed manufacturers to “Brailsford & Company, Inc.”

 An obvious error, since at 1 gram per hair a 86-hair element should theoretically withstand a tension of 36 grams, or at 1% grams per hair a corresponding tension of 54 grams.

 The plaintiff requested a finding summarizing its contention that the discount provision as it worked out amounted to an extortionate rate of interest. No finding as to this has been made because the argument it represents can be based on the factual contents of findings 41 through 43, m$>ra%