# E. J. ALBRECHT CO. v. UNITED STATES.
## No. 45579.

Court of Claims.
Jan. 7, 1946.

George R. Shields, of Washington, D. C. (King & King, of Washington, D. C., and Hirsch E. Soble, of Chicago, Ill., on the brief), for the plaintiff.

Gaines V. Palmes, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for the defendant.

WHALEY, Chief Justice, and LITTLE-TON, WHITAKER, and JONES, JJ.

JONES, Judge.

This suit grows out of the construction by plaintiff of an outlet channel, the purpose of which was to bypass excess water around the Sardis Dam on the Little Tallahatchie River near Sardis, Miss. Plaintiff had no part in the construction of the dam itself, which was being built at the same time.

The contract called for various items of work of which excavation, fill and concrete were a major part. The outlet structure comprised in its essential details an intake which was to be provided with gates to control the flow of water; an approach channel leading from above the dam to the gates; a conduit leading from the gates through an existing ridge or hill; a large and deep pool with concrete bottom, walls and baffles termed a stilling basin, into which the conduit emptied, and an outlet channel which was to connect the stilling basin with the river bed below the dam.

The contract as to excavation, fill and backfill was on a unit price basis. Prior to the submission of its bid plaintiff had inspected the site and not only investigated the test borings of the defendant but also made its own borings.

Notice to proceed on the work was received by the contractor May 11, 1938, and work was begun five days later. The original contract period expired on June 15, 1939, but extensions of time totaling 156 calendar days were allowed by the Government and the work was completed and accepted on November 18, 1939, within the time fixed for completion by the extensions granted. No liquidated damages are involved.

Plaintiff's claim for compensation is based upon increased costs for excavation, rolled fill and backfill. Plaintiff's expenditures for these three items were $142,120 more than it received as payment therefor.

It alleges that delays and increased costs were caused by two items: (1) improper refusal of the Government to permit plaintiff to use dry borrow pit material in rolled fill operations and (2) delay in agreeing to pay for the increased cost of imported concrete aggregate, which in turn postponed excavation in the stilling basin from the dry season to the rainy season.

### The Rolled Fill Controversy.

The rolled fill was intended to produce a densely compacted and more or less impervious surface in various parts of the structure. As defined in the specifications, the process of making rolled fill was to spread the materials in layers of about 6 inches, then harrow the same and subsequently

roll it with a roller having a series of staggered knobs spread over its cylindrical surface. The specifications in considerable detail set forth such matters as the depth to which the teeth of the harrow should penetrate, the weight of the roller and the number of passes of the roller over the material. They also particularly emphasized the necessity of having the correct moisture content in the material so as to give the greatest possible compaction.

Material portions of the contract relating to the rolled fill are set out in Finding 8. The following excerpts therefrom have a direct bearing upon the present issue: "(4) Should the material as dumped, spread, or moistened be too wet to permit in the opinion of the contracting officer, the securing of the desired compaction, the rolling shall be delayed until the material has dried to the required consistency. * * * The contracting officer may require at any time that any or all of the operations cease * * * when the moisture content of the excavated materials is excessive, such excavated materials shall be stock-piled at approved locations adjacent to the work until their use is authorized. No additional payment for such stock-piling will be made nor will any additional payment be made for the hauling of this material to its final position in the dam."

The specifications also stated (2–07 (e)): "Borrow Areas.—It is anticipated that sufficient material suitable for required fills will be available from the excavations prescribed by these specifications. Additional material for fill, if required, shall be procured from borrow areas 'C,' 'C–1,' and 'D,' located as shown on the drawings."

In May, 1938, plaintiff started its excavation work in the approach channel area and in the conduit area. These materials would have been suitable for use as rolled fill but for the fact that they were too wet to be immediately used and they were therefore placed in stock piles. The material in the stock piles failed to dry properly in time for its use as rolled fill in the approach channel. It was necessary for plaintiff to either harrow the top of the stock piles or do additional harrowing after the material was put in place.

Plaintiff complained to the project engineer about the extra labor and cost involved in the drying of the material, and requested that in lieu of using the stock pile material it be permitted to excavate from borrow pits where the material was relatively dry. Plaintiff was told that it could use borrow pit material for rolled fill if desired, but that no payment could be authorized for excavating such material.

The real issue therefore is not that plaintiff was refused the use of borrow pit materials in lieu of the stock-piled material that was too wet at the time, but that the contracting officer, through his representative, the project engineer, did not feel at that time that the Government should incur the added expense of 25 cents per cubic yard for excavation from the borrow pits when it had already paid the same amount for the excavation of material which was suitable for rolled fill with the exception of its moisture content.

█ Plaintiff orally asked for written instructions on this issue but the project engineer advised him that he had no written instructions to give except what was in the contract. Plaintiff cites this as a reason why no appeal was taken during the progress of the work, stating that plaintiff was under no obligation to appeal from a matter as to which the contracting officer had refused to give written instructions.

Paragraph 1–19 of the specifications relating to protests and appeals states in part: "* * * If the contractor considers any work required of him to be outside the requirements of the contract, or if he considers unfair any action or ruling of the inspectors or contracting officer, he shall ask for written instructions or decision from the contracting officer immediately. Any protest based upon such instructions or decision, or claim otherwise arising under the contract, including a request for extension of time under Article 9, shall be submitted to the contracting officer within the period specified in the contract. If the contractor is not satisfied with the ruling of the contracting officer he may, where so provided in the contract, make written appeal to the Chief of Engineers. * * *"

To plaintiff's position we can not agree. The above-quoted portion not only permits a protest based upon written instructions, but, in addition, on any claim otherwise arising under the contract. If plaintiff, having asked for them, had been refused written instructions this fact alone could have properly formed the basis of a protest and a subsequent appeal. If the project engineer, as the authorized representative of the contracting officer had refused to make a decision a different ques-

tion would have been presented. But he made a prompt decision, which was to the effect that no written instructions were necessary other than those embodied in the contract.

The rolled fill in the approach channel was substantially completed about the middle of October, 1938 (97%).

Excavation was also carried on in the conduit area from May, 1938, to November of that year. This material was comparatively dry at the time it was excavated and was placed in a stock pile and intended for refill in the conduit cut after the conduit had been constructed. During the winter of 1938–1939 heavy rains and high water occurred and this stock pile as well as others became so wet that when rolled fill in the conduit area was begun it was again necessary for plaintiff to further process this material in order to make it sufficiently dry for compacting.

On January 31, 1939, plaintiff renewed its request for excavating material from borrow pits. At a conference with defendant's representatives plaintiff's superintendent Fry referred to certain computations which he had made which showed there would be insufficient excavated material to complete the rolled fill and it would be necessary in any event to use about 85,000 cubic yards of borrow pit material to complete this part of the work. It was the first time these figures were presented to the defendant.

Following this conference the contracting officer authorized the use of borrow pit material, and plaintiff used some 7,140 cubic yards of borrow pit material between the 8th and 15th of March.

Following a written request on April 3, 1939, relative to the use of borrow pits for rolled fill work, the Government issued a change order under date of April 20, 1939, modifying the contract and permitting the plaintiff to excavate borrow pit material for use in rolled fill.

On May 20, 1939, plaintiff wrote the contracting officer calling his attention to the excessively high water content of the rolled fill materials and to the fact that it would not dry readily, and requested an extension of time of 62 days. On June 12, 1939, the contracting officer responded by issuing a change order extending the contract time 67 calendar days and ·stating as a· reason for the time extension— "* * * this amount of delay in perform-

ance of the work under said contract has been caused by the occurrence of river stages so high and rainfall so excessive in quantity as to give the material excavated from the outlets of the channel and required to be placed as rolled fill such a high water content as to result in the said delay in its placement. * * *" This change order was accepted by plaintiff without protest.

About six weeks after acceptance of this change order plaintiff for the first time in writing called attention to the fact that the required use of the excessively wet impervious material had greatly increased the unit cost of the work and interfered with its progress. In this letter plaintiff urged that it was entitled to relief and that it would submit the matter of increased costs as soon as the work was completed. Such a claim was filed in October, 1939, and overruled by the contracting officer. It was then appealed to the authorized representative of the head of the department and was in turn denied by him.

### The Gravel Controversy.

The specifications with reference to the gravel to be used in making concrete are set out in detail in Finding 19. It was stated that the coarse aggregate should consist of "hard, tough and durable particles * * *." The specifications also indicated that the gravel should be subjected to freezing and thawing tests and to analyses to determine conformity with the requirements of the specifications.

About six weeks after plaintiff had begun this work on the contract and under date of June 30 plaintiff notified the Government as to its contemplated source of gravel. This was from a local gravel pit known as the "Partee pit." Eleven days after this notification plaintiff was advised by the contracting officer's representative that it had been found that the gravel from the Partee pit contained a deleterious substance called chert. It is not disputed that chert, which is a flintlike substance, fibrous in character, absorbs moisture and upon freezing causes the stone to expand or pop out and leave pockmarks in any concrete facing in which it is used. Three days later a conference was held between plaintiff and defendant's representatives.

At this conference plaintiff argued that the amount of chert in the Partee gravel was within the percentage allowed by the specifications, but at the same time plain-

tiff agreed that "pop-outs" would mar the appearance of certain of the architectural structures and agreed to furnish imported gravel at plaintiff's own expense for this portion of the work provided the Government would approve the local gravel proposed for use in the rest of the concrete work. This offer of plaintiff was placed in writing on the following day, July 15, and was at first rejected, but on August 6 the contracting officer reconsidered the matter and in writing gave permission to use the local gravel for all parts of the structures except the following:

Intake Approach Walls above elevation 235 feet.

Upper part of Intake Structure.

Operating House (Entire).

Service Bridge (Entire).

Stilling Basin Walls above elevation 203 feet.

As indicated in this letter, this permitted the local gravel to be used where it would not be exposed to frost action. This date on which permission was granted to use local gravel is of special importance and in connection therewith reference is made to the fact that the local gravel was subsequently used for approximately 60 percent of the total concrete work in the stilling basin.

Attention is also called to the fact that prior to the time this permission was granted there appears to have been no extended delay due to the gravel controversy other than the initial six weeks' period between the time plaintiff began its work and the time it first notified defendant of its source of gravel. This period is of course chargeable to plaintiff.

On August 15 plaintiff furnished the contracting officer with information on additional sources of gravel for that portion of the structures in which the Government had refused the use of local gravel. By September 24 the Government had completed tests of the samples and approved the use of Mississippi River gravel either from Memphis, Tenn., or Greenville, Miss.

About ten days later and on October 4 the plaintiff furnished the contracting officer details on additional costs of furnishing the Mississippi River gravel or what is termed imported gravel in this case, and requested an increase in unit costs of $1.90 per cubic yard of concrete.

Plaintiff's chief engineer, Mr. Fry, who took charge of the construction work at the site on October 28, 1938, held a conference during the first week of November with defendant's engineers on the matter of the additional price. A second conference was held about the middle of November which was adjourned with the understanding that a change order would be issued incorporating the increased cost of the imported gravel. About a month later on December 15, a change order was transmitted to plaintiff, which recognized the increased cost of the imported gravel and granted a total increase of $13,688 based on an increase per cubic yard of $2.04 for concrete in which other than local gravel would be required. Plaintiff refused to sign the proposed change order because it did not allow additional time. On December 27 plaintiff requested a time extension of 75 calendar days, stating in effect that the excavation in the stilling basin had been delayed because of the gravel controversy. This was the first time that plaintiff had made any complaint or protest about delay due to the gravel situation. The change order was then amended, allowing the plaintiff an additional time of 25 calendar days. This change order was accepted by the plaintiff without protest and approved by the district engineer at Vicksburg, Miss., January 28, 1939.

Plaintiff urges that the refusal of the contracting officer to permit the use of the Partee gravel throughout the structure was improper under the terms of the contract and was a breach thereof, and that the extended controversy delayed the excavation of the stilling basin until the rainy season, and thereby increased the costs to plaintiff.

 The first question here presented is one of fact. The record before us is silent as to the amount or percentage of the deleterious chert present in the Partee gravel. No reports of tests have been furnished. The contracting officer stated in a letter addressed to plaintiff on July 25, 1938 that—"Under paragraph 5-07 of the specifications for the Outlet Structures the proposed aggregate is considered to contain chert in quantities considered deleterious and therefore not acceptable for use in the concrete for any part of the structures."

The controversy was settled by plaintiff's being permitted to use the Partee gravel below the frost line where the chert could do no damage. Plaintiff accepted without protest a change order by the terms of

which it was paid $13,880 additional for the imported gravel. The facts do not show arbitrary action on the part of the contracting officer, nor do they show a breach of the contract. Plumley v. United States, 226 U.S. 545, 547, 33 S.Ct. 139, 57 L.Ed. 342.

We come now to the question of whether the delay in settling the gravel controversy increased the cost to plaintiff of excavation in the stilling basin. On August 6, 1938, use of the local gravel had been approved by the contracting officer for foundations in the intake approach, the conduit, and the bottom of the stilling basin. Plaintiff's concrete mixers and equipment, however, did not arrive on the job until September 9, a month later. It was of course necessary to complete timber piling before the pouring of the concrete foundation slabs. The timber piling was completed in the intake approach September 15, 1938, and it was not until the week of October 16–23, approximately a month thereafter and two months after the local gravel had been approved, that the first concrete was poured in the foundation slabs of the intake approach. The following week, October 24–30, the contractor began to pour concrete in the conduit section. Concrete work was completed in the intake approach during the week of January 16–23, 1939, and it was not until the following week, with the concrete work 92 percent complete in the conduit section, that the contractor began to pour concrete in the stilling basin. Sixty percent of the concrete used in the stilling basin was made from Partee gravel and permission to use this reached back to August 6, 1938.

We do not know how long it took plaintiff to pour the lower part of the concrete in the stilling basin which involved this 60 percent, but more than a month previous to pouring any concrete in the stilling basin, plaintiff had received the change order dated December 13 which indicated that plaintiff would be paid the $13,880 extra for the imported gravel, and it had known a month previous to that date, namely, at the conference about the middle of November, that such a change order would be written.

In submitting its bid, plaintiff had submitted the usual progress chart. A comparison between plaintiff's progress chart and the actual progress of the various portions of the work shows that on December 27, when plaintiff first complained that excavation in the stilling basin was being delayed, the excavation on the entire job was over 80 percent complete as compared to plaintiff's estimated excavation at that same time of approximately 74 percent. Viewing the total excavation work, plaintiff at the time it complained that it was behind in the stilling basin excavation, was ahead of its own progress estimate.

At this point we refer to Finding 6, the last sentence of which was excepted to by plaintiff. This finding refers to the fact that plaintiff had planned a certain sequence of operations. In these plaintiff had planned to do the excavation work first in the stilling basin.

Plaintiff takes exception to the last sentence in this finding, the last paragraph of this finding being as follows: "Plaintiff did not proceed with the work as it had planned. The Government engineers felt that the intake approach channel should be built first, and plaintiff was requested to begin work in the approach channel. Plaintiff agreed to this change in plans. This change subsequently disrupted the work."

In its brief and objections, plaintiff states that this is excepted to as unsupported by any testimony in the record, and that this change of operations, to which the plaintiff agreed, did not do other "than merely necessitate a slight change in the plan of operations."

The president of the plaintiff corporation, Mr. Albrecht, testified on direct examination as follows:

"48Q. You stated what your plans were. Were you permitted to go ahead as you planned; and, if not, why not? A. No, sir. The engineers felt that the intake approach channel should be built first and urged us to complete the intake approach channel first.

"49Q. Could you undertake to explain something as to what shifting your work in that fashion meant in the way of affecting an orderly progress of work or did it affect it? A. It would not have affected it if conditions were like anticipated. That is why we agreed to the change and tried to accommodate the engineers. As conditions developed, it disrupted the work entirely."

It would not have been a wise procedure to make the deep excavation for the stilling basin too far ahead of the con-

crete work therein because of the difficulties of keeping the same dewatered and the sloughing in of the embankments. Plaintiff was at fault in permitting the six weeks' period to elapse between the time it started work and the time it made available to the Government samples of the aggregate which it desired to use. Also had not two months elapsed between approval of the local gravel and the pouring of the first concrete in the foundation slabs of the intake approach, for which no reason is given, plaintiff could have completed the concrete work in the intake approach channel sooner than the week of January 16–23, 1939, and could at least have begun to pour the foundation slabs in the stilling basin with the Partee gravel earlier than the end of January. We have here three and one-half months' delay unexplained by the plaintiff and surely not chargeable to the gravel controversy.

 The rulings made during the summer and early fall of 1938 by the contracting officer and the district engineer in charge of the work, to the effect that the Government could not incur extra excavating expense for plaintiff to excavate dry material from borrow pits merely because the stock piles had too high a moisture content to use at that time for rolled fill, were not an unreasonable application of the terms of the contract. Standard Accident Ins. Co. v. United States, 102 Ct. Cl. 770, 788.

There was no warranty under the contract as to the degree of moisture content or how long it would take the excavated material to dry to the point where it could be used for rolled fill. This would naturally depend upon weather conditions and the manner in which it was stock piled.

The contract contained the usual clause permitting disputes concerning questions of fact to be decided by the contracting officer, with appeal to the authorized agent of the head of the department whose decision was to be final.

On October 16, 1939, plaintiff filed with the contracting officer a claim for additional payment in the sum of $194,583.11. This claim was based on alleged excess costs incurred by plaintiff in excavation, rolled fill and backfill work, and was predicated upon (a) rejection of local gravel and the alleged delay before the gravel controversy was terminated, and (b) the rulings of the contracting officer with respect to the use of excessively wet material for fill. The contracting officer denied this claim, and plaintiff appealed to the Chief of Engineers who was the duly authorized representative of the head of the department. On May 24, 1940, the Chief of Engineers denied plaintiff's claim on appeal.

Plaintiff in its bid apparently underestimated the unit cost of the rolled fill and was unfortunate in the weather conditions subsequently encountered.

 As to the delay in the excavation of the stilling basin, until the rainy season and the incurring of increased costs because of this, plaintiff had agreed to postpone this work and excavate the approach channel first. The additional delays that occurred during the gravel controversy are largely chargeable to the plaintiff.

We find that there was no breach of the contract and that the denial by the contracting officer and the Chief of Engineers of plaintiff's claim filed October 16, 1939, was not arbitrary or unreasonable.

The petition is dismissed. It is so ordered.

MADDEN, Judge, took no part in the decision of this case.