SOUTHEASTERN OIL FLORIDA, Inc. v. UNITED STATES.

No. 49518.

United States Court of Claims.
Sept. 30, 1953.

Robert K. McConnaughey, Washington, D. C., for plaintiff. Shea, Greenman, Gardner & McConnaughey, Washington D. C., were on the brief.

Kendall M. Barnes, Washington D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This suit was brought by Southeastern Oil Florida, Inc., to recover money withheld by the defendant for the contamination of aviation gasoline transported by the plaintiff for the defendant and to recover for certain transportation and demurrage charges in connection with the contaminated gasoline. Plaintiff's petition seeks a judgment of $37,710.66.

The main issues in the case are: (1) whether the plaintiff's claim is barred by its failure to exhaust its administrative remedies under its contract with the defendant; and (2) whether the contamination of the aviation gasoline was caused by plaintiff's negligence in failing properly to clean and prepare the barge which transported the gasoline. Other issues relate to the amount of damages plaintiff may recover if it should be determined that plaintiff is entitled to recover.

Plaintiff entered into Navy Contract N5sx–6690 with defendant for, among other things, the transportation of Navy-owned aviation gasoline from Port Everglades and Jacksonville, Florida, to the Naval Air Station at Banana River, Florida.

This contract and its accompanying schedule provided that:

"Schedule

\* \* \* \* \*

III. Responsibility for Government-Owned Material

\* \* \* \* \*

"(g) The transportation of any Government owned product or material by barge shall be at the Government's sole risk of loss and damage from any and all causes whatsoever except loss and damage caused directly by bad faith, wilful misconduct or negligence of the contractor, its employees and agents in the care and custody of the cargo or by lack of due diligence in furnishing a seaworthy craft."

The barge which transported the aviation gasoline which became contaminated

was named the Walker 17. On July 12, 1946, it was loaded with 177,220.96 gallons of aviation gasoline owned by the defendant and drawn from plaintiff's leased Shore Tank No. 3 at Port Everglades, Florida. The hatches of the Walker 17 were then sealed, and it was towed by plaintiff to Banana River, Florida, arriving there on or before July 15, 1946.

Upon its arrival a sample of the gasoline was taken by the defendant, and tests showed the gasoline had become contaminated. The tests disclosed a gum content averaging 17 milligrams (mg.) per 100 milliliters (ml.) of gasoline whereas the specification requirements were for a maximum of 5 mg. of gum per 100 ml. of gasoline. Defendant thereupon refused to accept the gasoline or to authorize its discharge at Banana River, and on July 19, 1946, pursuant to defendant's authorization, plaintiff towed the Walker 17 to plaintiff's storage facilities at Jacksonville, Florida.

Subsequently, on August 7, 1946, a conference was held between representatives of the parties, and an interim oral agreement was entered into which was designed to dispose of the Walker 17's cargo as promptly as possible and to establish an agreed basis for minimizing the loss to whichever party would eventually have to bear it. Plaintiff then proceeded, from August 23, 1946 to November 11, 1946, to discharge the contaminated gasoline into plaintiff's shore storage tank at Jacksonville, and simultaneously to blend it with the low lead content ethyl gasoline. Upon completing the discharge of the contaminated gasoline on November 11, 1946, plaintiff notified defendant immediately, and on December 5, 1946, the Navy permitted the release of the Walker 17 to the plaintiff.

By letter of December 27, 1946, the contracting officer notified plaintiff that it had been determined that the aviation gasoline in question had been contaminated as a result of plaintiff's negligence in failing properly to clean and condition the Walker 17 prior to loading, and that demand was being made upon plaintiff to replace the gasoline or to reimburse the Navy for its value (see finding 37).

The contracting officer subsequently issued his decision and findings of fact, dated November 20, 1947, in which he determined that plaintiff was liable to the defendant for the contamination of the aviation gasoline in the amount of $31,051.84 or the replacement of the gasoline (see finding 38). In December 1947, the defendant charged the plaintiff $31,051.84 for the value of the gasoline by withholding that amount from payments due plaintiff under other contracts between the parties.

In December 1947, plaintiff filed a timely appeal with the head of the department from the decision of the contracting officer. The defendant's counsel moved to dismiss the plaintiff's appeal on the ground that it presented only issues of law. In February 1950, the head of the department not having made any decision on the defendant's motion, the plaintiff filed the instant suit in this court. On March 10, 1950, the Board of Contract Appeals, as the representative of the head of the department, denied the defendant's motion, and indicated that it would receive evidence in the case. No evidence has been presented before the Board.

We take up first the defendant's contention that this court is barred from considering plaintiff's claim because of plaintiff's failure to exhaust its administrative remedies under Section 20 of its contract with the defendant. Section 20 of the contract provides that:

"Section 20. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer, subject to written appeal by the Contractor within thirty days to the Secretary of the Navy, whose decision shall be final and conclusive. * * *"

Defendant argues that because plaintiff's appeal to the head of the department is still pending, this court has no jurisdiction of plaintiff's claim. It is true that a contractor must exhaust the administrative remedies provided in its contract before it is entitled to bring suit in this court. United States v. Blair, 321 U.S. 730, 735, 64 S.Ct. 820, 88 L.Ed. 1039, United States v. Joseph A. Holpuch Co., 328 U.S. 234, 240, 66 S.Ct. 1000, 90 L.Ed. 1192. These cases also set forth the exception to this rule, however, which is that a contractor is not prevented from suing in this court where the administrative appeal procedure provided in its contract is, in fact, inadequate or unavailable. In the Blair case, the Supreme Court recognized that, 321 U.S. at page 736, 64 S.Ct. at page 823:

"If it were shown that the appeal procedure provided in the contract was in fact inadequate * * * we would have quite a different case."

Likewise, in the Holpuch decision, the Supreme Court stated that 328 U.S. at page 240, 66 S.Ct. at page 1003:

"And in the absence of some clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain in a court."

In this case, the plaintiff having appealed to the head of the department and the head of the department having failed for more than two years to indicate whether he would or would not take jurisdiction of the appeal, the plaintiff was justified in regarding the administrative appeal procedure as inadequate and in filing its suit in this court. Having filed its suit, it was not required to abandon that suit and resume the administrative procedure. See Latvian State Cargo & Passenger Steamship Line v. United States, 88 F.Supp. 290, 115 Ct.Cl. 811, 814.

With respect to whether plaintiff was negligent in failing properly to clean and prepare the barge Walker 17 for transporting the aviation gasoline, the defendant argues that the doctrine of *res ipsa loquitur* applies because the defendant has shown that the gasoline was not contaminated when it was loaded on the Walker 17 but that it was contaminated when it reached its destination. We agree that the doctrine applies here since the barge was under the plaintiff's exclusive control, and that such circumstances shifted the burden of going forward with the evidence to the plaintiff to show its freedom from negligence. Sweeney v. Erving, 228 U.S. 233, 240–241, 33 S.Ct. 416, 57 L.Ed. 815.

Plaintiff, however, has proceeded to show that it exercised reasonable care in cleaning and preparing the barge for transporting the aviation gasoline. It has shown that the barge was given the customary type of cleaning for the purpose of transporting aviation gasoline by a commercial tank cleaning company (see finding 12); that after the cleaning, the barge was observed to be exceptionally clean and free from rust scale or petroleum residue (see findings 13 and 14), and, that the condition of the barge was found to be satisfactory by the naval inspector who examined the barge's tanks by looking down the hatches immediately prior to the loading of the gasoline (see finding 15).

Defendant contends that the evidence shows that the barge had, prior to its being cleaned, carried "black oil," and that consequently plaintiff was negligent in failing to "upgrade" the barge, *i. e.,* to carry successively such products as kerosene and housebrand gasoline which would remove by solvent action most of any "black oil" which had penetrated into and adhered to the interior crevices of the barge's tanks.

The record as a whole persuades us that the Walker 17, prior to its being cleaned, had probably carried a "black oil" one grade lighter than the Bunker C grade of "black oil" (see findings 10 and 11). We have reached this conclusion on the basis of all the evidence, but especially in view of the fact that Mr. Williams of the commercial company

which cleaned the barge stated, both before and after the contamination occurred, that the barge had contained a "black oil." Mr. Williams saw the barge's condition when he supervised the cleaning of the barge, and he made these statements regarding "black oil," first, to Mr. Pickren, a commercial chemist, as they were inspecting the barge prior to its being loaded, and second, to Mr. Fentress, the Naval Intelligence officer, shortly after the barge's cargo had been found to be contaminated.

It is our conclusion, however, that the defendant has failed to show that plaintiff was negligent in cleaning and preparing the barge to carry aviation gasoline in view of its having previously carried a "black oil" one grade lighter than Bunker C. Although the evidence offered by the defendant tended to show that, at the time of the trial in 1951, "upgrading" had become a usual procedure for converting "black oil" barges for use in carrying aviation gasoline, we think the evidence established that such was not the customary procedure in the trade at the time the Walker 17 was cleaned in 1946.

■ Consequently, we conclude that the defendant has failed to show that plaintiff did not exercise reasonable care in cleaning and preparing the Walker 17 for the carriage of aviation gasoline.

Regarding the amount of damages to which plaintiff is entitled, defendant contends that if plaintiff is not liable for the contamination, plaintiff's recovery should be $19,015.38. Plaintiff argues, however, that its damages amount to approximately $36,642.66 (see finding 8).[1] This difference in amounts is due to disputes as to the applicable value of the contaminated gasoline, as to whether plaintiff is entitled to transportation charges in towing the contaminated gasoline from Banana River to Jacksonville, and as to whether plaintiff is entitled to demurrage charges for

the retention of the Walker 17 while its cargo was being discharged at Jacksonville.

Defendant contends that an oral agreement entered into between the parties on August 7, 1946 (see finding 23) is controlling as to the measure of plaintiff's damages. This agreement provided that, pending future conferences to determine responsibility for the contamination, the plaintiff would blend the contaminated gasoline with its own commercial stocks. If plaintiff was not liable for the contamination, plaintiff would pay the defendant 9 cents per gallon for the gasoline, but if plaintiff was liable, it would replace it in kind. Also if plaintiff was liable, it was agreed that plaintiff would be allowed to buy the replacement gasoline from refineries at Baton Rouge, Louisiana, under the Navy supply contract at not exceeding 9¾ cents per gallon.

Pursuant to the agreement, plaintiff blended the contaminated gasoline with commercial ethyl gasoline at Jacksonville from August 23, 1946, to November 11, 1946. Subsequently, by letter dated December 27, 1946, defendant notified plaintiff that plaintiff was liable for the contamination and that demand was being made upon it to replace the aviation gasoline or to reimburse the Navy for its value. The defendant did not, however, make available to the plaintiff an opportunity to buy replacement gasoline under the Navy supply contract.

■ We agree with the defendant that this oral agreement is binding upon the parties as to the measure of plaintiff's damages. There is nothing in the record to indicate, as plaintiff suggests, that defendant's representatives were without authority to enter into this agreement, and we cannot presume such a lack of authority. See United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131; Oak Worst-

[1]. If plaintiff recovers for transportation from Banana River to Jacksonville, demurrage charges (item c in finding 8) should be reduced by three days or $180.-00.

ed Mills v. United States, 36 F.2d 529, 68 Ct.Cl. 539, 557.

We see no reason, moreover, why the defendant's failure to hold conferences or to make available to the plaintiff an opportunity to buy replacement gasoline under the Navy supply contract would render the provisions of the agreement inapplicable. If plaintiff were liable for the contamination, the defendant would still be legally bound to permit replacement at 9¾ cents per gallon under its Navy supply contract as plaintiff admits in its brief. Likewise, if plaintiff were not liable, plaintiff would still be bound to pay the defendant 9 cents per gallon for the gasoline.

Plaintiff's damages with respect to the applicable value of the contaminated gasoline should therefore be measured by the difference between the $31,051.84 withheld by the Navy and the value of the contaminated gasoline at 9 cents per gallon ($15,949.89). Plaintiff's damages with respect to the value of the contaminated gasoline are thus $15,101.95.

In addition, the defendant concedes that plaintiff is entitled to transportation charges of $1,949.43 from Port Everglades to Banana River, demurrage charges of $768.00 on the tug Maxine, and demurrage charges of $1,196.00 on the barge from July 15 through August 7, 1946. The plaintiff claims, however, that it is also entitled to $1,949.43 for transporting the contaminated gasoline from Banana River to Jacksonville and an additional $5,680.00 for demurrage charges for the retention of the Walker 17 until the barge was permitted to be released to it by the Navy on December 5, 1946.

Because the transportation of the gasoline from Banana River to Jacksonville was agreed to by the parties on account of the hazard the barge created at the Banana River docks, and because the barge was subject to Navy orders and contained Navy property, we think this transportation was on behalf of the Navy and that plaintiff is entitled to the contract price of $1,949.43 for the transportation.

We also think plaintiff is entitled to additional demurrage charges of $5,680.-00 to December 5, 1946. During that period, the barge was under the Navy's control, and the contract provided that demurrage should be charged while the barge was held by the Navy. In addition, it appears to us that the oral agreement reasonably contemplated that the barge would be used while plaintiff was blending the contaminated gasoline with its commercial stocks.

Accordingly, plaintiff is entitled to recover $26,644.81.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.