### NEW YORK SHIPBUILDING CORPORATION

v.

### The UNITED STATES.

No. 97–66.

United States Court of Claims.

June 9, 1967.

Edgar H. Brenner, Washington, D. C., for plaintiff. Paul A. Porter, Sarah C. Carey, Arnold & Porter, Washington, D. C., Glickstein, Crenshaw, Glickstein & Hulsey, Jacksonville, Fla., and Richard A. Hinckley, Camden, N. J., of counsel.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S REQUEST FOR REVIEW OF THE COMMISSIONER'S ORDER DENYING DEFENDANT'S MOTION TO SUSPEND PROCEEDINGS

DAVIS, Judge.*

This case grows out of the construction by the plaintiff for the defendant of the N.S. SAVANNAH, the world's first nuclear-powered passenger-cargo ship. The work was done under a contract (No. MA–1675) (entered into as of November 16, 1957) between the plaintiff and the defendant (acting through the Maritime Administrator and the Director of the Division of Reactor Development, Atomic Energy Commission). Unlike the usual Government construction contract, which vests in an official designated in the contract as the "contracting officer" both the authority to act for the Government in the day-to-day administration of the contract and the quasi-judicial function of deciding disputes concerning questions of fact arising under the contract, this agreement did not contain any reference to a "contracting officer." Instead, the administration of the contract on behalf of the Government was provided for in Article 34 of the general provisions, which stated in part that "Authority to give directions under this contract and to approve for the Government actions taken by the Contractor in the performance of the contract work shall be vested in such officers or employees of the [Maritime] Administration or the [Atomic Energy] Commission as they jointly designate". Article 35 of the general provisions, entitled "Disputes," stated that "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement of the parties to this contract, shall be de-

cided by the Nuclear Projects Officer of the Maritime Administration," with the contractor having the right to appeal within 30 days from the decision to the Maritime Administrator.

The N.S. SAVANNAH was delivered to the defendant at Yorktown, Virginia, on May 1, 1962. Subsequently, about May 20, 1963, the plaintiff submitted its final claim to the defendant. The claim contained more than 131 pages of text and exhibits; it set forth in a detailed and comprehensive manner the final payment due under the contract, and the amount claimed was broken down under various headings. According to the claim, the total contract price was $39,892,180 (later revised to $39,842,336.42). Of the total amount claimed, the sum of $8,721,747.53 was unpaid as of May 1, 1963. (According to the petition, the defendant later made a payment of $71,419.50 in December 1965 and a further payment of $1,235,000 in January 1966, so that the sum of $7,415,328.03 is said to remain due and unpaid.)

Rather extensive negotiations between the parties followed the submission of the plaintiff's final claim. On September 20, 1965, the plaintiff received from E. M. MacCutcheon, Chief, Office of Research and Development, Maritime Administration, a letter dated September 17, 1965, and stating in part as follows:

> The claim has been examined and considered exhaustively with full consideration of all elements including the claimed costs of disruption, delay and the other construction problems associated with the construction of the N.S. SAVANNAH and the related work required under the Contract. As Chief, Office of Research and Development, I find on the basis of the above examination and consideration that New York Shipbuilding Corporation is properly entitled to the sum of $33,882,625 for its claim with respect to the Contract.

* The court is grateful to Trial Commissioner Mastin G. White for his order and opinion on the motion. We have used them extensively, and adopt his findings with miniscule changes.

This is a final decision of the Chief, Office of Research and Development. New York Shipbuilding Corporation may appeal this decision in accordance with the provision of the Disputes Article of Contract No. MA–1675.

About September 30, 1965, the plaintiff filed a notice of appeal with the Maritime Administration. In this notice, the plaintiff pointed out that the letter purporting to be a final decision of the contracting officer had not been signed by the Nuclear Projects Officer of the Maritime Administration, as provided in Article 35 of the general provisions of the contract. The plaintiff requested written assurance that Mr. MacCutcheon's letter, in the view of the Maritime Administration and of the Atomic Energy Commission, constituted the decision of the contracting officer.

On October 26, 1965, representatives of the plaintiff had a conference with officials of the Maritime Administration in Washington. The plaintiff's representatives repeated a request that had been previously made over the telephone for a detailed explanation of the decision purporting to be that of the contracting officer, and indicated that it would be improper to require the plaintiff to base an appeal on Mr. MacCutcheon's letter of September 17, 1965, since that letter did no more than state a conclusion, unsupported by factual findings.

Early in November 1965, the Maritime Administrator informed the plaintiff that "In the view of the Maritime Administration, Mr. MacCutcheon's letter does constitute such decision [of the contracting officer] * * *." On November 30, 1965, after further requests for information sufficient to enable the contractor to determine the basis for Mr. MacCutcheon's decision, he furnished a list of figures, which indicated only the amount requested and the amount allowed with respect to various portions of the claim.

In a letter of February 21, 1966, addressed to the Maritime Administrator, the plaintiff stated that it was still awaiting a decision within the meaning of the "Disputes" provision, and asserted that it was entitled to such a decision. The plaintiff reiterated its position that the list of figures furnished by Mr. MacCutcheon on November 30, 1965, without any explanation, did not provide a sufficient basis for an appeal. As of March 18, 1966 (3 days prior to the filing of the petition in this court), the plaintiff had not received a reply to its letter of February 21st.

 These are among the allegations—thus far undenied [1]—in the petition which was filed on March 21, 1966, and asserted various claims of breach of contract and failure to make awards under the contract. The petition said that it was unnecessary and futile for the contractor to seek further administrative relief and that immediate resort to this court was appropriate.

The next step (aside from a stipulation extending the Government's time to answer or respond to the petition) was the present motion, filed by the defendant on August 10, 1966, to suspend proceedings in the court. According to this motion, the Maritime Administrator, on March 23, 1966 (two days after the petition was filed), appointed a panel of three Government officials to act as the Administrator's authorized representatives for the purpose of hearing the plaintiff's appeal. The motion asks that the proceedings here be suspended "until the conclusion of the administrative proceedings now pending before the Maritime

---

[1]. Defendant challenges our right to take the undenied allegations of the petition at face value, but although the Government was the moving party it did not file any affidavits or documents contradicting those allegations, or put in an answer. In the absence of a substantial denial by the moving party, we are entitled to accept the factual assertions in the petition. In this respect the motion to suspend should be treated as a motion to dismiss. Cf. United States v. New Wrinkle, Inc., 342 U.S. 371, 376, 72 S. Ct. 350, 96 L.Ed. 417 (1952); Guessefeldt v. McGrath, 342 U.S. 308, 310, 72 S.Ct. 338, 96 L.Ed. 342 (1952); Callaway v. Hamilton Nat'l Bank, 195 F.2d 556, 559 (C.A.D.C.1952).

Administrator so as to give the said Administrator an opportunity to hold a hearing and issue a decision on the plaintiff's appeal from the contracting officer's decision." Conceding that the major substantive areas of its claim could have been decided under the Disputes clause if a proper decision had been made, the plaintiff opposed the motion on the ground that the Government had failed to provide a "timely and meaningful contracting officer's decision from which an appeal could be taken and a proper administrative hearing held."

Commissioner White denied this motion (on September 6, 1966) in an order stating that "it is unclear from the record now before the court whether this claim was ever acted on by the duly designated contracting officer", but placing the ruling mainly on the ground that Mr. MacCutcheon's summary letter of September 17, 1965, containing a mere decision without factual findings, "was not the sort of decision on the disputed questions of fact involved in the plaintiff's claim for which the plaintiff had contracted in Article 35 of the general provisions of the contract."

On the defendant's request for review of the commissioner's order, the court heard argument and then entered an order referring the case back to the commissioner "for determination, by a trial or other proceedings, as to whether E. M. MacCutcheon was the contracting officer for the Government under Article 35 of Contract No. MA–1675 on September 17, 1965, when he issued his letter of that date." A trial on that issue was then held, with oral testimony and documentary evidence. The commissioner concluded that Mr. MacCutcheon was not the contracting officer as of September 17, 1965, and was not authorized by Article 35 to decide disputes under the contract. We have had another oral argument, and the case is now before us for disposition of defendant's request for reversal of the commissioner's original order denying suspension. We agree with Commissioner White that Mr. MacCutcheon was not authorized by the contract to decide the disputed claim, and on that ground we uphold the refusal to suspend further proceedings in this court.[2]

The biblical line of succession, as set forth by the commissioner, is not disputed. At the time when the contract was entered into, one of the major organizational components of the Maritime Administration was a Nuclear Projects Office, headed by an official with the title of Nuclear Projects Officer. The Administrator had delegated to the Nuclear Projects Officer authority for the direction and administration of those programs and activities of the Maritime Administration relating to the design, development, and construction of nuclear-powered merchant ships, and the approval of changes with respect to such construction, subject to specified monetary limits. R. P. Godwin was the Nuclear Projects Officer and the head of the Nuclear Projects Office. Also, at about the time of the contract, the Maritime Administration and the Atomic Energy Commission set up an inter-agency joint group, headed by a project manager who was to act as the representative of the Government in giving directions under the contract and approving actions taken by the contractor in performance. The full title of this Government representative was "Project Manager for the Joint MA–AEC Group." R. P. Godwin, the Nuclear Projects Officer, was likewise designated by the two agencies as the Project Manager for the Joint MA–AEC Group. He assumed the duties and responsibilities of the latter position in December 1957.

On April 8, 1960, as part of an overall consolidation of the research and development functions of the Maritime Administration, the Office of Research and Development and the position of Chief, Office of Research and Development, were established in the Administration; the

---

**2.** We do not reach the other ground on which the commissioner primarily rested in his first order—that Mr. MacCutcheon's "decision" was invalid for failure to contain appropriate factual findings.

Nuclear Projects Office and the Nuclear Projects Officer were abolished; and the functions and personnel of the Nuclear Projects Office were transferred to the newly created Office of Research and Development. The latter Office was given the broad responsibility "for planning, evaluating, organizing, coordinating and directing all research and development activities of the Maritime Administration," and, in connection with these activities, was authorized (among other things) to negotiate and administer contracts.[3] For us, the significant aspect of this assignment is that, unlike the Nuclear Projects Office, the Office of Research and Development had responsibility, not only for nuclear-powered merchant ships, but also for all types of merchant ships (with which the Maritime Administration was concerned) and for all of the Administration's research and development activities. It is also significant that Article 35 of the contract, dealing with the subject of "Disputes," was never amended in connection with the abolition by the Maritime Administration of the position of Nuclear Projects Officer.

Effective April 8, 1960, R. P. Godwin was appointed by the Maritime Administration as Acting Chief, Office of Research and Development. Mr. Godwin continued to perform his duties of administering the contract as Project Manager for the Joint MA–AEC Group. On November 7, 1961, E. K. Sullivan succeeded Mr. Godwin as Acting Chief, Office of Research and Development. Mr. Sullivan was also jointly designated by the Maritime Administration and the Atomic Energy Commission to succeed Mr. Godwin as Project Manager for the Joint MA–AEC Group.

As of January 16, 1962, the Maritime Administration set up the Division of Nuclear Projects as an organizational unit within the Office of Research and Development. The order creating the Division declared that it should (among other things) "Be responsible for planning, organizing, administering, and executing approved research and development projects involving the design, development, construction and test operation of prototype nuclear ships, components, systems and equipment * * *." This Division was headed by an official with the title of Manager, who was a subordinate of the Chief, Office of Research and Development. John E. Robb was appointed as Manager, Division of Nuclear Projects.

Effective July 30, 1962, the Maritime Administration appointed E. M. MacCutcheon to succeed E. K. Sullivan as Chief, Office of Research and Development. Mr. MacCutcheon continued to serve in this position until July 1966. However, he was not jointly designated to succeed Mr. Sullivan as Project Manager for the Joint MA–AEC Group. About August 9, 1962, the Administration and the Commission designated John E. Robb to serve as Project Manager. As we have pointed out, he was the Manager of the Division of Nuclear Projects, and in this capacity served under the supervision of Mr. MacCutcheon, Chief of the Office of Research and Development. On Febru-

---

3. The official description of the functions of the Office of Research and Development was as follows:

"The Office of Research and Development is responsible for planning, evaluating, organizing, coordinating and directing all research and development activities of the Maritime Administration, designed to improve the efficiency and effectiveness of the United States merchant marine, physically and operationally, in consonance with the needs of national defense and of the foreign and domestic commerce of the United States; in connection with these activities, initiates, develops, and recommends approval of specific projects; establishes fund requirements and maintains control of funds allotted for approved projects; negotiates and administers contracts, or directs contract work in connection with such projects, relying primarily on outside contractors for the conduct of advanced studies, design, construction, and test operation of special components and systems, and prototype components and ships; and participates with other Government agencies and private organizations in research and development of joint interest."

ary 17, 1964, D. L. Crook succeeded Mr. Robb as the Project Manager for the Joint MA–AEC Group. Mr. Crook also followed Mr. Robb as Manager, Division of Nuclear Projects; in this post, Mr. Crook was also a subordinate of Mr. Mac-Cutcheon.

In August 1965, the N.S. SAVANNAH became a "developed ship", i. e., it had been constructed, the testing phase had been completed, and it had been turned over to the Maritime Administration for operation. The Joint MA–AEC Group came to an end on August 20, 1965, and the position of Project Manager for the Joint MA–AEC Group passed out of existence. On September 2, 1965, the Administration wrote to the Commission requesting concurrence, in view of the demise of the Joint Group, in the designation of the Chief of the Office of Research and Development as the "responsible Contracting Officer"—i. e., the administering official under Article 34—on plaintiff's contract. The Commission gave its concurrence on September 27, 1965.

This detailed recital shows that: (1) the contract expressly vested in the Nuclear Projects Officer of the Maritime Administration—to whom the Administration had specifically committed chief concern with nuclear-powered merchant ships—the quasi-judicial function of deciding disputes concerning questions of fact arising under the contract; (2) the Maritime Administration unilaterally abolished the position of Nuclear Projects Officer while the contract was in the process of being performed; (3) the contract was never amended by the parties so as to make some other arrangement for decisions to be made on disputes; (4) the Maritime Administration office to which was transferred the functions of the Nuclear Projects Officer (i. e. the Office of Research and Development) dealt with all the Administration's research and development, not only with nuclear-powered ships, and Mr. Mac-Cutcheon, as the chief of that Office, was concerned with the broad range of all of Maritime's research and development

activities; (5) at the time Mr. Mac-Cutcheon rendered his decision on September 17, 1965, there was in his Office a Nuclear Projects Division, whose manager (Mr. Crook) was specifically concerned with nuclear-powered merchant ships; (6) Mr. MacCutcheon, as Chief of the Office of Research and Development, was not concerned (so far as his official duties reveal) only or primarily with the problems of nuclear-powered vessels but had a far broader spectrum of functions; and (7) the Maritime Administration official whose official work (after the appointment of Mr. MacCutcheon) was centered on nuclear-powered ships was the manager of the Division of Nuclear Projects (within the Office of Research and Development)—Mr. Robb succeeded by Mr. Crook.

Although the Maritime Administration directed Mr. MacCutcheon to handle plaintiff's claim when it was first filed in May 1963, we cannot hold that, either at that time or up to September 17, 1965, he was the official designated by Article 35 to determine factual disputes arising under the contract. This was not the normal agreement in which the Government alone has the selection of the contracting officer who is to decide such controversies. On the contrary, the parties expressly chose and named a specific official—the Nuclear Projects Officer of the Maritime Administration—as the initial decider (subject to an administrative appeal). More than that, the contract separated this function of deciding disputes from the day-to-day supervision of performance. By Article 34 the latter responsibility was given to a Government representative to be selected by the Administration and the Commission, with no participation by the contractor in the choice; in contrast, the parties jointly placed in the contract the specific official who was to determine disputes. In the absence of any other showing, we must take as meaningful this striking departure from the conventional governmental system for deciding disputes. The parties agreed upon a special officer—not any individual designated by the Gov-

ernment—for this important duty. The contractor, in particular, bargained for the Nuclear Projects Officer as the first tribunal to determine controversies.

■ This would not mean that the Maritime Administration could not change the title or the occupant of that post. But it does mean, in our view, that the Government could not unilaterally substitute another official, with different general functions, for the Nuclear Projects Officer. The only rational purpose we can assign to the express contractual choice is that the Nuclear Projects Officer would be the Maritime Administration official most directly and exclusively concerned, at the highest level, with the design and construction of the SAVANNAH, and that the contractor wanted its claim determined (in the first instance) by the one official so directly and immediately involved—presumably the official most thoroughly acquainted with the nature and problems of the construction of a nuclear-propelled merchant vessel.

Mr. MacCutcheon's position, Chief of the Office of Research and Development, was not a mere change in the name of the former Nuclear Projects Officer. It was a materially different and broader job, with responsibility for all of the Maritime Administration's research and development, including not only nuclear ships but all the other vessel-types with which that agency is concerned. The former Nuclear Projects Office had a much more limited scope. The substantial enlargement of that Office's functions, when it became the Office of Research and Development, changed its character and altered the status of its head. He was no longer involved solely (or even primarily, if one takes the statement of his official duties on its face) with nuclear propulsion, and necessarily had to spread his attention, his concern, and his knowledge onto a much wider area. Atom-powered vessels were, of course, under his wing but so were a number of other subjects to each of which he was supposed to give due consideration. Unlike the Nuclear Projects Of-

ficer whose work he absorbed, the Chief of the Office of Research and Development was not a specialist concentrating on nuclear vessels; he was much more of a generalist with fingers in several large pies. He would not be expected to be as intimately knowledgeable in, or to have as much time to spend on, the pertinent aspects of nuclear-power-construction as the former Nuclear Projects Officer, or as MacCutcheon's current subordinate, the Manager of the Division of Nuclear Projects.

The Government brushes aside, as formal and technical, this considerable difference between the Office of Research and Development and the old Nuclear Projects Office (and the consequent distinction in the functions of their respective heads), but we cannot be so cavalier. The difference in the presumed degree of concentration on nuclear projects amounts to a significant difference in kind. It is as if a construction contractor, with a project in a particular area, who has agreed upon a determination by the cognizant District Engineer, thereafter finds that district office merged into the Office of the Chief of Engineers or the Office of the Secretary of the Army, and the "disputes" determination made by the Chief of Engineers or the Secretary, personally. Such a contractor can rightly complain that he bargained for a decision by an official who presumably would know much more about the local matter than these top officers, with their manifold responsibilities and the varied demands on their time and attention—that he bargained for a decision rooted in concentration, not in dilution. Cf. Williams Engr. & Contracting Co. v. United States, 55 Ct.Cl. 349, 382–383 (1920). So, here, plaintiff's contract gave it the right to a decision by the official focusing exclusively on nuclear projects, not by one who was expected to juggle many other subjects as well.

Defendant tells us, by way of argument, that in fact Mr. MacCutcheon knew as much about the subject as anyone, including Mr. Crook (the head of the Division of Nuclear Projects). We do not

know whether this is so or not—there are no findings on the point; defendant did not request the trial commissioner to make such a finding; defendant did not except to the commissioner's omission of such a finding; and defendant's brief does not point to any evidence supporting its statement on oral argument [4]—but in any event we must consider the question, not on the basis of Mr. MacCutcheon's actual expertise as it may have been in 1965, but from the parties' standpoint when the contract was made in 1957. Looking forward from that time, the parties selected a particular officer on the reasonable assumption (as we judge) that he was most likely to have the knowledge necessary to an informed decision of contractual disputes under this unusual contract. That choice was locked into the agreement and became a contractual term. As with other contract provisions, the agreement would not be automatically altered if the forecast proved incorrect in that by chance some other official turned out to know as much or more.

Nor can we agree that insistence on a decision by the contractual official is hypertechnical or unrealistic. It may be that, in some instances, the "reality" is that the designated individual merely rubber-stamps a subordinate's or superior's findings, but we must presume that the parties intend otherwise—that they desire that in the end he put his own mind to the problems and render his own decisions. That has been the consistent teaching of this court in the past (see the opinions cited in footnote 5, infra) and we shall not today sanction an erosion of responsibility by holding that it makes no difference whether or not the chosen officer does his work. Similarly, the existence of boards of contract appeals should not be used to weaken the contracting officer's (the initial decider's) obligation. The appellate hearing may be de novo, but a proper and conscientious first decision is still important—it may go for the contractor and thus obviate the need for an appeal; in any event the fact of an adverse decision in the first instance puts the burden on appeal upon the contractor; and the appellate board may in some areas rely on the contracting officer's expertise or judgment.

The Government also makes two waiver arguments. The first is that, after submitting its claim, the plaintiff negotiated with Mr. MacCutcheon and therefore must be taken to have accepted him as the deciding official. Again we do not know how often or on what basis these negotiations with Mr. MacCutcheon were carried on. Without a stronger showing, we can find no waiver. Settlement negotiations are often had with a contracting officer's superiors or with other persons in the agency; plainly, the superiors (at the least) have normal authority to participate in settlements under the rule of Cannon Constr. Co. v. United States, 319 F.2d 173, 162 Ct.Cl. 94 (1963), and Brock & Blevins Co. v. United States, 343 F.2d 951, 170 Ct.Cl. 52 (1965). Plaintiff points out, in addition, that "breach" claims as well as "dis-

4. It is to be noted that Mr. MacCutcheon, as of the time when his purported decision of September 17, 1965 on the contractor's claim was rendered, had never been jointly vested by the Maritime Administration and the Atomic Energy Commission with the authority generally to administer the contract under Article 34, and therefore would not have the knowledge coming from that day-to-day supervision. This authority was originally conferred by the two agencies upon R. P. Godwin (who was also the Nuclear Projects Officer of the Maritime Administration at the time); it was next given to E. K. Sullivan; then to John E. Robb; and ultimately to D. L. Crook.

The Maritime Administration did propose to the Atomic Energy Commission on September 2, 1965—which was more than 2 years after the contractor submitted its claim and after the vessel had been fully completed—that the Chief, Office of Research and Development, Maritime Administration (i. e., Mr. MacCutcheon) be made responsible, under Article 34, for the rest of the contract. However, the concurrence of the Atomic Energy Commission in this proposal was not noted until September 27, 1965, which was 10 days after Mr. MacCutcheon had purported to act on the contractor's claim under Article 35.

putes" or "contractual-type" claims were involved in the negotiations.

The other waiver point is that the plaintiff has never raised or preserved the contention that Mr. MacCutcheon was not the proper deciding officer. This is incorrect. Plaintiff has relied mainly on the point that the "decision" of September 17, 1965, contained no findings, but it did preserve the other argument. In responding on September 30, 1965, to the Administration's letter of September 17th, plaintiff indicated its doubts as to MacCutcheon's status, and again in February 1966 requested confirmation of his authority. The petition in this court specifically refers to these matters, and the plaintiff's memorandum in opposition to the motion to suspend pointed out (though summarily) Mr. MacCutcheon's uncertain status; the memorandum on the first argument before the court also adverted to this problem. Plaintiff tells us that it could not be more specific because it did not know the details of the various reorganizations within the Maritime Administration until after this court ordered a hearing on the issue. At the trial and thereafter plaintiff has asserted vigorously that Mr. MacCutcheon was without authority. On this record we hold that the issue is properly before us and has not been abandoned.

■ Having found that the plaintiff did not receive a determination by the proper decider, we must adjudge the con-

sequences of the defendant's failure. The court has often declared that a contractor is entitled to a finding by the contractually agreed officer and that a decision by someone else is a nullity.[5] We can act therefore as if, prior to bringing suit here, plaintiff received no determination at all of its claims under the contract. Those demands were filed in May 1963 and this action was not commenced until March 1966, almost three years later. In between there were some settlement negotiations, but the petition tells us that these were ended by February 1965. We believe that a proper administrative decision should, and could, have been forthcoming considerably before March 1966, and that the contractor had a right to such a determination prior to that time. The defendant's delay was so long and so unjustified that the Government must be held to have breached its implied covenant to render a timely and appropriate decision. Cf. C. J. Langenfelder & Son, Inc. v. United States, 341 F.2d 600, 605, 169 Ct.Cl. 465, 473–474 (1965); H. B. Zachry Co. v. United States, 344 F.2d 352, 356–357, 170 Ct.Cl. 115, 122 (1965); Garod Radio Corp. v. United States, 307 F.2d 945, 946–947, 158 Ct.Cl. 596–600 (1962); Oliver-Finnie Co. v. United States, 279 F.2d 498, 503, 150 Ct.Cl. 189, 196–197 (1960). Not only was the mere lapse of time inexcusable but this delay was compounded by the improper attempt to have the wrong officer decide the dispute (and then only in summary fashion)

---

5. John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 705–706, 132 Ct.Cl. 645, 659–661 (1955); Climatic Rainwear Co. v. United States, 115 Ct.Cl. 520, 559 (1950); United States Cas. Co. v. United States, 67 F.Supp. 950, 954, 107 Ct.Cl. 46, 68 (1946); McShain v. United States, 65 F.Supp. 589, 591, 106 Ct.Cl. 280, 350–351 (1946); Livingston v. United States, 101 Ct.Cl. 625, 638–639 (1944); James McHugh Sons, Inc. v. United States, 99 Ct.Cl. 414, 431 (1943); Hirsch v. United States, 94 Ct. Cl. 602, 634 (1941); H. W. Zweig Co. v. United States, 92 Ct.Cl. 472, 482 (1941); Phoenix Bridge Co. v. United States, 85 Ct.Cl. 603, 629 (1937); Karno-Smith Co. v. United States, 84 Ct. Cl. 110, 124 (1936); Sun Shipbuild-ing & Dry Dock Co. v. United States, 76 Ct.Cl. 154, 191, 192, 193 (1932); Standard Dredging Co. v. United States, 71 Ct.Cl. 218, 246–248 (1930); Burton Coal Co. v. United States, 60 Ct.Cl. 294, 312, 313–314 (1925), aff'd, 273 U.S. 337, 47 S.Ct. 337, 71 L.Ed. 670 (1927); Williams Engr. & Constructing Co. v. United States, supra, 55 Ct.Cl. 349, 381–383 (1920); King v. United States, 37 Ct.Cl. 218, 246–248 (1930); Burton & Koester Lumber Corp. v. United States, 188 F.2d 986, 988 (C.A.D.C.1951); United States v. North American Commercial Co., 74 F. 145, 149 (C.C.S.D. N.Y.1896); Halvorson v. United States, 126 F.Supp. 898, 901–902 (E.D.Wash. 1954).

and the ensuing six-months' delay in the creation of the board of appeals.

In these circumstances, we cannot grant the Government's motion to suspend. No proper initial decision has been rendered administratively, there is nothing from which to appeal, and there is nothing for the appeal board to consider. The requisite first step, the initial determination under Article 35, has not yet been taken. The elapsed time is now over a year more than when the petition was filed. There is no good reason to allow the administrative process, so long delayed, to start now. After suit has been rightly begun, the court has, in comparable cases, refused to wait for belated, *post-litam motem*, administrative proceedings to be prosecuted. Oliver-Finnie Co. v. United States, supra, 150 Ct.Cl. 189, 279 F.2d at 503, 150 Ct. Cl. at 196–197; Southeastern Oil Florida, Inc. v. United States, 115 F.Supp. 198, 201, 127 Ct.Cl. 480–485 (1953).

It follows, too, that the merits of plaintiff's claims can and should now be tried in this court. Where the administrative remedy has proved to be unavailable or inadequate—including cases, like this, in which a proper determination has been unduly delayed and suit has been begun here before any lawful decision— the court's practice has long been to try the case judicially. "Where the contracting officer fails to perform the duties imposed upon him by the contract, it is the duty of the court to perform this service and pass on the legal rights of the plaintiff." Karno-Smith Co. v. United States, supra, 84 Ct.Cl. 110, 124 (1936). "The plaintiff was fully justified in commencing this action when it did, and defendant cannot be heard to complain that the plaintiff should have suspended proceedings in this court and completed the administrative steps, when defendant's own action or lack thereof prompted plaintiff to bypass the normal administrative sequence and commence this suit." Oliver-Finnie Co. v. United States, supra, 279 F.2d at 503, 150 Ct.Cl. at 197.[6]

The Supreme Court's decisions in this area do not suggest any different result. That Court has affirmed that a contractor can bring suit, without exhausting his administrative remedy, if the remedy is inadequate or unavailable. United States v. Blair, 321 U.S. 730, 736–737, 64 S.Ct. 820 (1944); United States v. Joseph A. Holpuch Co., 328 U.S. 234, 239–240, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946). This exception to the general rule that fact-finding (under the contract) is for the administrators was recently approved in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 429–430, 86 S.Ct. 1539, 1543, 16 L.Ed. 662 (1966), where Mr. Justice White, after applying United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), pointed out that:

\* \* \* this Court has said on several occasions that the parties will not be required to exhaust the administrative procedure if it is shown by clear evidence that such procedure is "inadequate or unavailable." United States v. Holpuch Co., supra, at 240, 66 S.Ct. 1000; United States v. Blair, supra, at 736–737, 64 S.Ct. 820. It may be that the contracting officer,

**6.** See, also, H. B. Zachry Co. v. United States, supra, 344 F.2d 352, 356–357, 170 Ct.Cl. 115, 122 (1965); C. J. Langenfelder & Son, Inc. v. United States, supra, 341 F.2d 600, 605, 169 Ct.Cl. 465, 473–474 (1965); Garod Radio Corp. v. United States, supra, 307 F.2d 945, 946–947, 158 Ct.Cl. 596, 600 (1962); Reinking v. United States, 283 F.2d 527, 529, 151 Ct.Cl. 307, 311 (1960); Maxan Dress Corp. v. United States, 115 F.Supp. 439, 443, 126 Ct.Cl. 439, 441–442 (1953); Manufacturers' Cas. Ins. Co. v. United States, 63 F.Supp. 759, 760, 105 Ct.Cl. 392, 351 (1946); Cape Ann Granite Co. v. United States, 100 Ct.Cl. 53, 71 (1943), cert. denied, 321 U.S. 790, 64 S.Ct. 785, 88 L.Ed. 1080 (1944); Thomas Earle & Sons, Inc. v. United States, 100 Ct.Cl. 494, 504–505 (1944); James McHugh Sons, Inc. v. United States, supra, 99 Ct.Cl. 414, 431 (1943); Heid Bros. v. United States, 69 Ct.Cl. 704, 712 (1930); Brister & Koester Lumber Corp. v. United States, 188 F.2d 986, 988 (C.A. D.C.1951); and some of the other decisions cited in fn. 5, supra.

**438**

H. B. Zachry Co. v. United States, 344 F.2d 352, 170 Ct.Cl. 115, or the Board of Contract Appeals, Southeastern Oil Florida, Inc. v. United States, 115 F. Supp. 198, 127 Ct.Cl. 480, so clearly reveals an unwillingness to act and to comply with the administrative procedures in the contract that the contractor or supplier is justified in concluding that those procedures have thereby become "unavailable." Similarly, there may be occasions when the lack of authority of either the contracting officer or the administrative appeals board is so apparent that the contractor or supplier may justifiably conclude that further administrative relief is "unavailable." [5]

5. See United States v. Utah Construction & Mining Co., supra; C. J. Langenfelder & Son Inc. v. United States, 341 F.2d 600, 169 Ct.Cl. 465.

In this instance, for the reasons already given, we think that the inadequacy of the administrative relief appears clearly, and that the court is now seized of the whole case and can grant judicial relief.

All that this means is that the trial of the merits of plaintiff's claims will be held in this court rather than before an *ad hoc* board of contract appeals. The parties originally contemplated an administrative hearing but the defendant, not the contractor, has circumvented that provision of the contract by breaching the agreement to render a proper and timely initial determination. By this rupture of the contract defendant has lost its right to insist upon administrative findings and an administrative decision. The plaintiff can properly ask, as it has, for the court to proceed and decide, so that compensatory relief, if rightfully due, can be given.

The defendant's request to overturn the trial commissioner's order is denied and the commissioner's denial of the motion to suspend is affirmed. The case is remanded to the trial commissioner and will proceed in ordinary course. The defendant may have sixty days from this date to answer the petition.

